Connor
v.
Featherstone

</div>

---

[FRAUDULENT AGREEMENT.]

CONNOR and Others, Appellants, *against* FEATHERSTONE and Others, Respondents.

A question of fact upon a bill filed to set aside the sale and assignment of a land warrant, upon the ground that it was obtained by fraudulent misrepresentation, and taking undue advantage of the party's imbecility of body and mind.

Evidence deemed insufficient, and bill dismissed.

THIS cause was argued by Mr *White*, for the appellants, and by Mr. *Isaacks*, for the respondents.

<div align="right">Jan. 1.</div>

Mr. Justice TRIMBLE debvered the opinion of the Court.

This case comes before the Court by appeal from the decree of the Circuit Court for the Western District of Tennessee.

The bill was instituted by James Hibbits in his lifetime, and a'ter his death the suit was revived in the names of the appellees, his heirs at law, after which the defendants, now appellants, appeared and answered.

The object of the suit was, to have delivered up to the complainant a land warrant of 5,000 acres, which had been issued in the name of James Hibbits, upon an entry made by him in John Armstrong's office, No. 394., and to restrain James and Henry W. M. Connor, and each of them, from procuring a grant upon a survey which had been made and returned for the use of James Connor, by virtue of the warrant, under colour of certain assignments alleged by James and Henry Connor to have been made by Hibbits, and to have those assignments set aside.

It appears, that James Connor held a writing under seal, dated the 25th of September, 1796, purporting to be signed and executed by James Hibbits, to the following effect; " I, James Hibbits, of the county of Iredell, and State of North Carolina, for and in consideration of the sum of ninety-three pounds ten shillings, of the State aforesaid, have granted, bargained, and sold, to James Connor, of Mecklenburgh county, and State aforesaid, a 5,000 acre warrant entered in Colonel John Armstrong's office, No. 394, and I do authorise Colonel William Polke, or any of his deputies, or any other surveyor, to issue the returns, when the land is surveyed, in the name of James Connor."

The execution of this assignment is contested by the bill, which suggests, that a mere order for the delivery of the warrant was given, without any terms of transfer; but its due execution is expressly averred by the answer, and clearly sustained by evidence.

It appears, from the statements of the bill and answer of James Connor, that although this assignment purports to be general and absolute, there was a parol agreement and understanding between the parties at the time of its execution, qualifying its general import. But the parties

differ very materially as to the character and extent of this
parol agreement.    Both admit that Hibbits was indebted to
Connor a sum of money, which it was not convenient then
to pay, but they differ as to its amount.    Both agree that
the sum so due from Hibbits to Connor, and Connor's agree-
ment to pay to government a balance due upon the entry of
about twenty-four pounds, with the interest thereon due to
the State, and for which the warrant was detained, was the
consideration of the assignment.    Hibbits insists, that by
the agreement and understanding of the parties, the assign-
ment was intended as a mortgage or security for the debt,
together with the advance to be made to the government;
but Connor, in his answer, expressly denies such was the
character of the agreement, and insists it was, that Connor
should be proprietor of the warrant, so far as these sums
would go, at the rate of sixty pounds per thousand acres,
and that the residue should be held by him in trust for Hibbits.
It appears that Connor paid to the government 45 pounds,
17 shillings and four pence, the balance due upon the entry,
with interest, and procured the warrant to issue, and be
delivered to him, on the 29th of November, 1797.    It ap-
pears, that the adjustment and settlement of their respec-
tive interests in the warrant, was the subject of occasional
correspondence and negotiation between them from that
time until 1817; but that, as the land lay in the Indian
country, and could not lawfully be surveyed until the Indian
title should be extinguished by the general government, the
matter lay over until that period.

   It appears that in June, 1817, James Connor sent his son,
Henry W. M. Connor, with a power of attorney, and in-
structions, from North Carolina, to James Hibbits in Ten-
nessee, to adjust the business within, either by selling to
Hibbits Connor's interest in the warrant, or purchasing Hib-
bits' interest in it.    That on the            day of June, 1817,
at Hibbits' own house, a contract was made by Henry Con-
nor, as agent of James Connor, with Hibbits, by which Hib-
bits agreed to transfer and assign to James Connor, or his
agent for his use, all Hibbits' interest in the warrant, for
which Connor agreed to convey to Hibbits by deeds with
special warranty, Connor's right in two grants of 1000 acres,

*Right margin:*

1827.

Connor
v.
Featherstone

in Connor's name, calling to lie on Swift Creek; and also give a bond for the conveyance of 150 acres in Bedford county; in execution of which agreement an assignment of the whole warrant was accordingly executed by Hibbits, and deeds for the two grants of 1000 acres each, on Swift Creek, and a bond for the 150 acres in Bedford County, were executed by Henry W. M. Connor, as agent for James Connor.

The bill charges that this assignment was procured by Henry W. M. Connor "most fraudulently, and in the following manner :"—"that Hibbits was confined to his bed by a severe and long spell of sickness, under the influence of which he had laboured several months; that his intellect and his faculties were so much debilitated and impaired, that he scarcely knew any thing he was doing; that Henry Connor represented all the lands he proposed giving for the warrant as good and valuable lands; and he moreover represented that the land called for in said warrant lay south of, and without the limits of the state of Tennessee; all of which assertions and allegations of said Henry were false, and known by him to be so at the time. He had been correctly informed that the land lay in this state, (Tennessee,) and that it was very valuable; he had been offered for part of it six dollars per acre, and he also knew that the two tracts of 1000 acres each on Swift Creek had never been surveyed; and that the 150 acres in Bedford county had been taken by a better claim."

This is the substance of the charges of fraud and misrepresentation made in the bill, all of which are substantially denied by the answer.

At the hearing of the cause, the Circuit Court decreed that the assignment of the            day of June, 1817, should be set aside and held for nought; that neither of the Connors should hold any interest in the warrant by virtue of that assignment, and then proceeded to direct what interest the parties should respectively hold in the warrant, under the assignment and contract of 1796, and directed a release of the proportion allotted by the decree to the complainants accordingly.

It is plain that if the assignment of 1817 ought not to be set aside, the decree must be considered not only erroneous

but there can be no necessity for inquiring what interest each party should hold in the warrant under the contract and assignment of 1796, independently of the assignment of 1817. That matter was adjusted by the contract and assignment of 1817; and unless that assignment should be set aside for fraud and imposition, we cannot go behind it.

It is argued that James Hibbits was so diseased in mind and body as to be incapable of controlling his own conduct, and that undue advantage was taken of his imbecility by Henry W. M. Connor. We do not think the allegation supported by sufficient proof. The answer denies it; and William Cawley is the only witness who speaks directly to the purpose. William Alexander swears he was once at Hibbits' house in the summer of 1817; that Hibbits was in great agony, and then incapable of transacting business; but whether from the excess of bodily pain only, or conjointly from that and mental imbecility, he is silent. The former we think the fair and only import of his evidence, as he says nothing of the state of Hibbits' mind, but speaks expressly of bodily disease. Besides, it is uncertain whether this was before or after the contract; and cannot, therefore, furnish a circumstance in aid of Cawley's statements. Many other witnesses depose as to Hibbits' mental condition, whose statements are irreconcilable with Cawley's impressions. A letter written by Henry W. M. Connor to Adam Miller, in which he says, " Mr. Hibbits has found out that I made an advantageous trade with him, that the land was in the state of Tennessee, contrary to his expectation, and complains heavily that I took an advantage of him, that he was a little deranged at the time," is greatly relied on in argument, not only to prove Hibbits' insanity, but to prove Henry W. M. Connor misrepresented the situation of the entry of 5000 acres, and thereby deceived and defrauded Hibbits.

So far as the letter alludes to the state of Hibbits' mind at the time of the contract, and to "an advantage" having been taken of him, the writer evidently means to state only Mr. Hibbits' subsequent complaints, and not the facts or circumstances actually attending the transaction. The letter cannot, then, prove that Hibbits' was deranged, or that Connor took advantage of him, unless it is inferable from other parts

of the letter.   He says, Hibbits had found out that Connor had made an advantageous trade; but it would be a very strained construction of this language, to suppose Connor meant any thing more by it than a good bargain.

He says, Hibbits had found out the land lay in Tennessee, contrary to his expectation ; and it has been insisted in argument, that this fixes decisively upon Henry Connor the imputation of fraud and misrepresentation, as to the situation and value of the 5000 acres of land.   We do not think so.   In the very doubtful state of the question, where the state boundary would run, when ascertained by public authority, the various conjectures and opinions then existing on the subject, the near proximity of the land to the line, as afterwards established, no inference unfavourable to the fairness of Connor's conduct can justly be drawn from Hibbits' expectation at the time of the contract that the land was not in Tennessee, unless it were shown that Connor, by his representations, superinduced that expectation.   There is nothing in the letter, and we can discover nothing elsewhere in the evidence, conducing to prove that Connor, at the time of the contract, made any representation on the subject of the land being without or within Tennessee.

In the existing state of circumstances, in relation to the position of the state line, which was not fixed or known until long after, it could at most be but matter of opinion or conjecture, whether the land would or would not fall within Tennessee.   It is not shown that Henry W. M. Connor expressed even an opinion to Hibbits on the subject; and if Hibbits entertained an erroneous opinion, it would be going too far, in a matter, apparently involved, at the time, in uncertainty, to hold Connor responsible for that error.

The bill charges Connor with falsely representing the value of the 5,000 acres; but that is also denied by the answer, and there is no proof in support of the bill.

It is further argued, that the deeds made by Connor to Hibbits for the two tracts of 1,000 acres each, calling to be on Swift creek, being drawn by Henry W. M. Connor, and containing only a clause of special warranty, is evidence of the fraud and undue advantage taken of Hibbits' situation. The clause of warranty in the conveyances is to the follow-

ing effect, to wit: " That he, the said James Connor, for himself and heirs, shall and will warrant and defend the above named grant from the lawful claim or claims of any person or persons whatever; but it is hereby understood that the said Henry W. M. Connor, as agent for James Connor, does not obligate himself to warrant the land called for in the grant, but only to warrant the grant itself from all legal claims of any person or persons."

1827.

Connor
v.
Featherstone

Whatever singularity may, at first blush, appear in this clause of warranty, it vanishes when the state of the country, and the titles in it, are understood. The 5,000 acre entry of Hibbits, and the land given in exchange for it, in the contract of 1817, at that time all lay in the Indian country, and the Indian title thereon had not been extinguished. Although the warrant upon the 5,000 acre entry had issued, it had not been surveyed, and could not be lawfully surveyed until the Indian title should be extinguished by the general government. Although grants had issued for the two tracts of 1,000 acres each, calling to lie on Swift creek, it was very probable that they had issued, as is understood to have been the case in many instances, without actual surveys having been executed on the grant. By the laws and usages of the State, as understood to exist at the time, duplicate warrants could be procured, and located on other lands, whenever it appeared the land granted could not be identified for want of a survey, or was lost by a superior interfering claim. In such a state of things, it was evidently a risking bargain on both sides ; and the peculiar clause of warranty must be presumed to secure to Hibbits the benefit of procuring warrants for the grants, if the land could not be held by the grants themselves. The same remark may be applied to the 150 acres in Bedford county, with this additional observation, that as Henry W. M. Connor did not execute a deed of conveyance for it at the time of the contract, but a bond for a conveyance, if the 150 acres is lost, or he is otherwise unable to convey, he is liable upon his bond, unless he afterwards made a conveyance agreeably to his bond ; and in that case Hibbits would derive the same advantage of being entitled to a warrant for that quantity. notwith-

standing the opinion of Henry W. M. Connor, as expressed in his letter to Miller to the contrary.

The only remaining ground of argument relied upon in support of the decree of the Circuit Court is, that the consideration agreed to be given for the last assignment has failed, and the assignment ought, therefore, to be set aside. But the consideration agreed upon has not failed. Hibbits, as must be inferred from the deeds for the two tracts of 1,000 acres each, was not to have a good and indefeasible title; but such title only as the grants might give, with the incidental advantages resulting from them by the laws of the country. The 150 acres may constitute a claim for damages, but furnishes no ground for setting aside the assignment of 1817.

This Court is of opinion, there is not sufficient evidence to show that the assignment, dated the         day of June, 1817, was procured by fraud, or undue advantage taken of the situation of Hibbits; and that the said assignment ought not to have been set aside. The decree of the Circuit Court is, therefore, deemed erroneous, and must be reversed, and the cause remanded to the Circuit Court, with directions to dismiss the bill, with costs.