Hardeman *vs.* Downer.

BENJAMIN F. HARDEMAN, plaintiff in error, *vs.* JOHN DOWNER, defendant in error.

1. Homestead and exemption laws when made in good faith, to secure to the family of insolvent debtors a reasonable means of subsistence from the debtor's property, do not even, though retroactive, fall within the prohibition of article 10, section 1st, of the Constitution of the United States, declaring that no State shall pass any law impairing the obligation of a contract.

2. The Constitution of the United States does not prohibit a State from divesting a vested right, except when that right is vested by virtue of, and under a contract of the parties.

3. A creditor under an ordinary contract requires no vested right in the property of his debtor, and it is within the power of a State to declare which of the claimants against an insolvent debtor, a stranger or his wife and family, who, by law, have a legal right to a support from him, shall have preference.

4. The condition of this State in the formation and adoption of the Constitution of 1868 was anomalous, and it was competent for the Convention and the people, with the express consent of the United States, to adopt as a part of the Constitution, the article therein providing for a homestead, or any other provision designed to adjust the evils and inequalities produced by the ravages of the war, and the emancipation of the slaves; such provisions stand upon the footing of a compact between the State and the United States, at the close of the war, in adjustment of the inequalities produced between individuals by the settlement imposed upon the people by the United States. The Constitution of 1868 was made for a people without civil government, and no Court established by that Constitution can take upon itself a jurisdiction therein denied to it, by assuming a jurisdiction belonging to some Court of the civil government destroyed by the revolution. If the Constitution fails to carry over to the new organization such a jurisdiction as is necessary to enforce a legal contract, it is a *failure*, not in the power of the Judiciary to remedy. The evil, if it be one, is political, and rests with that power wherein is deposited the sovereignty of the State. The homestead provision of the Constitution of 1869, is retroactive, and applies to judgments, executions, and decrees, founded on debts contracted before its adoption, even though reduced to judgment before that time, and is without exception, save as therein provided. The exceptions in said provisions are also retroactive, and cover debts of the excepted character whenever contracted.

Each of the exceptions is to be read in connection with the words "judgment, execution or decree," and with such other words as are necessary to complete the sense, so that before each of said exceptions is to be understood, the words "judgment, execution or decree," founded on a debt contracted for the purchase-money, etc. (BROWN, C. J., concurred. WARNER, J., dissented.

Hardeman *vs*. Downer.

Constitutional laws.    Homestead.    Decided by Judge
ANDREWS.    Wilkes Superior Court.    April Term, 1869.

John Downer applied to the Ordinary of Wilkes county for
exemption of personalty, worth $1,000 00, and of his home-
stead under the Act of the 3d of October, 1869.    Nine hun-
dred and thirty acres of land, certified by the surveyor to be
worth not more than $2,000 00 in gold, and his personalty
were allowed him by the Ordinary.    But before the allowance
was made, Hardeman had filed objections to it, upon the
ground that he had a judgment against Downer which was a
lien upon all of said property, and he contended the same
could not be constitutionally exempted from said lien.    The
cause being in the Superior Court, by appeal from the Court
of Ordinary, it was admitted that Downer was the head of a
family, and resided in said county, that the proceedings for
exemption were all regular, and that Hardeman's judgment
and *fi. fa.* were regular and older than said Act, that said
*fi. fa.* was levied on said land before Downer filed his said
application, and that Downer had not sufficient property
besides said land to satisfy said judgment.

With these facts before the Court, counsel for Hardeman
moved to dismiss said application, because said Act was not
retroactive, or if it were, then it was unconstitutional, as
against said judgment, because it impaired the obligation of
the contract sought to be enforced by Hardeman.    The Court
overruled the motion, and the Ordinary's judgment was
affirmed.    The refusal to dismiss is assigned as error on each
of said grounds.

TOOMBS & DUBOSE, for plaintiff in error, cited Irwin's
Code, sections 2 and 6 ; 34th Ga. R., 387 ; Dwarris on Sta-
tutes, section 681 ; Ld. Raymond, 1352, to show that the
Act should be only prospective.    On the constitutional point
they cited Article 1st, 10th section Constitution United States.
Fletcher vs. Peck, 6th Cranch R., 87 ; New Jersey vs. Wil-
son, 7th Cranch R., 164 ; Terrill vs. Taylor, 9th Cranch R.,
43 ; Green vs. Biddle, 8th Wheat. R., 92 ; Bronson vs.

Hardeman *vs.* Downer.

Kinzie, 1 Howard's R., 319; McCracken vs. Haywood, 2d Howard, 612; Ogden vs. Sanders, 12 Wheat. R., 213, 231; Sturgis vs. Crowningshield, 4 Wheat. R., 122; Planters' Bank vs. Sharpe *et al.*, 6 Howard, 327; Biers vs. Houghton, 9th Peters, 359; Mason vs. Haile, 12 Peters, 373; Van Hoffman vs. The City of Quincy, 4th Wallace; The City of Galena vs. Amy, 5th Wallace; Aycock *et al.* vs. Martin, 37th Ga. R.; Cutts and Johnson vs. Hardee, 38th Ga. R. (They stated in argument that the judgment was obtained before the Constitution of 1868 was adopted.)

WILLIAM REESE, for defendant, reviewed said authorities and argued that nothing in them showed that the Court below had erred.

McCAY, J.

1. That no State shall pass any law impairing the obligation of contracts, is the plain letter of the Constitution of the United States, Article 1, Section 10, Part 1, and without doubt it is firmly settled, by a long series of decisions, that a State can no more pass a law professing only to regulate the remedy, though in fact impairing the obligation, than it can one acting directly upon the terms of contracts.

I do not care to examine in detail these various decisions. They all in express terms admit the power of the State over the remedy, and they all decide that if this power be so used as to violate the obligation of the contract, the legislation is void. 4 Wheat., 198; 12 Wheat., 213; Ib., 370; 9 Peters, 329; 1 How. 202; Ib., 315; 2 How., 608; 3 How. 707; 6 How., 330; 15 How., 334; 7 How., 279; 4 Wallace, 553. All of these cases admit that it is not every modification of the remedy that is void. Judge Woodbury, in the case of Planters' Bank vs. Sharp *et al.*, says upon modifications of the remedy: "Some other laws are referred to which are upheld and which affect the whole community, and seem to violate some of the important *incidents of contracts* between individuals, or between them and corporations. But it will usually be found that these laws are only such as relate to future con-

tracts, *or if to past ones*, relate to *proceedings in Courts*, to the *form of the remedy, merely, to priority in some classes of creditors*, (5 Cranch, 298,) *to the kind of process*, (9 Peters, 319 ; 10 Wheat. 51,) to the *length of the statute of limitations*, (6 Wheat., 131 ; 2 Mason, 168 ; 3 John. Chan., 190 ; 4 Wheat., 200 ; 1 Howard, 315,) *to exempting the body from imprisonment*, (4 Wheat., 200,) *or tools and household goods from seizure*, (16 John., 244 ; 1 Hin., 15 ; 11 Martin, 730,) or affecting some *privilege* attached to the person or territory, and not to the terms or obligations of the contract itself. But if professing to alter the remedy only, the duties and rights under the *contract itself* are changed or impaired, it comes within the *spirit* of the constitutional principle. Planters' Bank vs. Sharp *et al.*, 6 Howard, 330.

It was said in argument that the test is, " Has the value of the contract been lessened ?" and this very case of Planters' Bank vs, Sharp *et al.* is referred to as sustaining that idea. This would indeed be a rule, and, if it were such, it would also be a sweeping onslaught upon nearly every Act of a State Legislature regulating the remedies afforded for contracts. Under such a rule it is hardly possible to conceive of a modification of the remedy that would not be void. Any Act creating the least delay, or casting the least new duty upon the obligee, as a law requiring a bond for costs before suit, or a law permitting an appeal from one tribunal to another, would all be void, since it is plain that it is not the degree of interference which makes the law void, but the fact that the contract is at all impaired. If the laws in force at the time of the contract, relating to the remedy, form a part of it, then any law in the least changing the remedy is void, since it is not the extent of the change, but the fact of the change, which is prohibited. But though the case referred to, of Planters' Bank vs. Sharp *et al.*, does contain some such language, yet the very instances Judge Woodbury there puts of valid laws necessarily contradicts such an idea.

The repeal of the attachment or garnishment laws of a State, the change of the number of terms per year of the Courts, and a hundred other laws, admitted to be valid,

Hardeman vs. Downer.

would do this.  Indeed, the same Court has over and over again upheld, as valid, law after law of the State Legislatures under which the contract was by no means worth as much as it was without the law.  The strangest of the cases, is that holding valid a law abolishing imprisonment for debt, and actually discharging from custody a debtor arrested on a judgment founded on a contract made before the law was passed, 12 Wheaton, 200 ; Ibid, 370 ; 9 Peter, 329.

But the Supreme Court in a subsequent case, to Planters' Bank vs. Sharp *et al.*, to wit: Van Hoffman vs. City of Quincy, 4 Wallace, 553, quotes this language of Judge Woodbury, and adds to it the following significant modification : " This has reference to legislation which affects the contract directly, and not incidentally, or only by consequence," so that there is, and in the nature of the case there can be, no rule upon the subject.  Each case must stand upon its own merits, since in the case of modifications of the remedy, a power, which all the cases admit to be in the States, it would seem to depend from the decisions upon whether there is in fact a substantial remedy left or not.  It is very pertinently said that without any remedy a contract is of no legal value at all, and that the denial of *all* remedy is as much a violation of the obligation of a contract as an Act permitting it to be discharged without payment.  On the other hand, it is so clear from the history of this clause, and from the universal practice of the States, that it was not intended to interfere with the fullest discretion in the States over their own modes of procedure, that it is often a nice question whether any particular Act is only the exercise of the admitted power to modify the remedy, or is, though professing to be only a change of the remedy, in fact an impairing, a change of the terms of the contract, and it is upon this discussion that the uncertainty and conflict of decisions has arisen.  Nothing is clearer than that there is a distinction between the contract of the parties and the remedies which the State furnishes for the breach of it.  Indeed there are very few contracts which the laws enforce in their terms by enforcing their specific performance.  Courts of law never do.  They accord to the

party damages for the breach of the contract; they punish the defaulter for his violation of his promise. If the contract, for instance, be that A will pay to B one hundred dollars on a day certain, and A fails, it is not in the power of the Courts to compel the performance of the contract as agreed upon, for the simple reason that the day is past; the Courts may adjudge that B do recover from A that much money with certain damages for his failure, and may direct that A's property be sold, and that the proceeds be applied to the discharge of his obligation to B, but they dó not and cannot compel A to perform in terms his agreement, for that was to pay at a fixed time. So, too, if A agrees to deliver property, as corn, hay, cotton, or what not, to B, it may be, nay often is, the specific article B desires to get, and has contracted for; yet, even Courts of Equity, except under extraordinary circumstances, do not and will not require the specific performance of the contract. If it be broken they will give to the obligee a *remedy* in damages according to the facts of the case. It is indeed very rarely that Courts enforce contracts according to their terms. They merely give the parties a remedy for the breach of these terms, and these remedies are of various kinds. If the contract is for less than $100 00, by our law one can have a remedy for the breach of it before a justice, without a jury, and in a month's time. If it is for over $100 00, the only remedy is in the Superior Court, and it will take from six to twelve months to obtain it. If it be a contract for rent, judgment may be had at the first term, or the party may obtain a distress warrant. Indeed, there are a great number of remedies, as by attachment, by garnishment, by proceedings under the various lien laws, by foreclosure, etc., and of these some are far more efficient than others. There are, too, various modes in use for the enforcement of judgments, as by sequestration, by attachment for contempt, by *fieri facias,* by *scire facias,* by extent, by *ca. sa.* Some of these take only land and sell it, others only personal property, others only take the land until the use of it pays the damages, and others take the body of the debtor. These all are remedies, and some far more effective than

others. In many cases the *ca. sa.* was the most efficient. Indeed it was often the only effective remedy. *That,* it is admitted by all, may be taken away entirely, so that any other of the usual remedies be left, and who, after reading the decisions with which the books are full, would say that it would not be competent for a State to alter or abolish its attachment or garnishment laws, extend or limit the jurisdiction of its Courts with summary powers, abolish entirely one of its forms of execution, or modify, at its pleasure, all or any of its remedies? As to that particular form of a modification which consists in exempting from levy and sale such portions of the debtor's property as are necessary for the subsistence of himself and family, or for carrying on his ordinary occupation, the cases in the Supreme Court of the United States are uniform in affirmance of the validity of such a law. Sturges vs. Crowningshield, 4 Wheat., 198; Ogden vs. Sanders, 12 Wheat., 213; Bronson vs. Kenzie, 1 Howard, 311; Planters' Bank vs. Sharpe *et al.*, 6 Howard, 327; and Van Hoffman vs. The City of Quincy, 4 Wallace, 553.

Judges Marshall, Story, Taney, Woodbury and Swayne have in these decisions, over and over again, announced this as the settled rule. The Supreme Court of New York, of Pennsylvania, of Michigan, of Mississippi, of Kansas, and of various other States, have solemnly affirmed the same doctrine. 1 Kernan, N. Y. Rep, 292; 2 Douglass, (Mich.,) 197; 3 Kansas, 124. At last, therefore, the real question is, does our Homestead Law come within the *principle of these decisions?* Is it the exemption of such of the debtor's effects as may fairly be considered necessary for the subsistence of the debtor's family, and for carrying on his usual occupation? Who is to judge? Without doubt it must be the law-making power. Should it make a grossly excessive exemption, so as to show that its object was not so much to protect its people from destitution as to enable debtors to screen valuable effects from the payment of their debts, perhaps it would be the duty of the Court to interfere. Our Constitution, not a mere legislative act, made for temporary purposes, but the fundamental law, exempts real estate of the value of $2000 00

in specie, and personalty to the value of $1000 00.   Is this excessive?   Does it indicate a mere temporary purpose to defeat existing creditors ?   The fact that it is made a part of the Constitution, the fundamental law for the future government of the State, shows that it is contemplated as the settled policy of the Government, and that it is not intended merely to obstruct the collection of existing debts.   Nor is it excessive so as to show that its intent is, not to subserve a great public policy, but to hinder and defeat creditors in obtaining their just demands.   How is such a question to be settled ? Is not land in a country where nearly all are farmers as much a necessity as the tools of a trade?   Is not a house to live in just as important as a bed to sleep on ?   What is a reasonable amount must of necessity be an open question.   Perhaps as good a way to settle it as any is to refer to the practice of the States.   In Georgia, by the old law, it was fifty acres of land for each head of a family, and five acres for each child under fifteen years of age, and various specified articles of personal property.   There was, if the land was only used for agricultural purposes, *no limit to its value*, it might be, and often was, worth but one dollar per acre, or it might be, and often was, worth fifty dollars per acre, and this independant of the improvements upon it, which might be of any value the debtor was able to erect.   In California it is a lot of land with appurtenances not worth over five thousand dollars.   In Illinois it is not to exceed one thousand dollars, in Indiana three hundred dollars, in Iowa five hundred dollars, in Maine five hundred dollars, in Massachusetts eight hundred dollars, in Michigan fifteen hundred dollars, in Minnesota eighty acres of land, or if in a town, one town lot, and these independent of value, in Mississippi one hundred and sixty acres of land, or town property worth not more than fifteen hundred dollars, exclusive of buildings and improvements, in New Hampshire five hundred dollars, in New York a lot and buildings not worth over one thousand dollars, in Ohio five hundred dollars, in South Carolina fifty acres, in Texas two hundred acres, without regard to value, or, if in a city or town, a lot worth two thousand dollars.   Is

the practice of all these States nothing? Is their conception of public policy no guide? The authorities I have quoted, including such names as Marshall, Taney, Story, Woodbury, Gibson, Baldwin and Swayne, all of them, without exception, assert it as the settled law, that " even as against existing debts a State may exempt the necessary implements of agriculture, the tools of a mechanic, and articles of necessity in household furniture." It will be noticed that this rule is not a statute with specified exemptions, pointing out in detail the articles a State may exempt. It is a *principle* deduced by these great men from the nature and objects of government, and from their understanding of the nature and extent of that clause of the Constitution of the United States under discussion. Is it supposable that this *principle*, in its *nature*, is confined to implements of agriculture, and tools of trade, and household furniture, that it includes a hoe, and a plow, and a wagon, which are implements, but not a horse to pull them ; that it covers $2,000 00 worth of tools, but not one dollar's worth of land, that it covers beds and chairs, but not a house to put them in ? The *principle* on which this power in the States has, by all these great men been upheld, is, that a State has some other objects as well as the enforcement of debts ; that it may be, and is, a great and important object of public policy that its people shall not be reduced by misfortune to the last extremity, even that just debts may be paid.

It stands upon the footing of the right to make a public road over granted land, and of that whole class of powers which depend upon the right of the State to legislate for the public weal, even though, in doing so, one man may suffer more than another. Is it of high public importance—a matter in which the State, as the guardian of its people, has an interest—that the women and children shall not be homeless, and that all shall be encouraged to secure in the State a permanent abode, and improve it ? So the people of this State have long thought, and for nearly thirty years there has been exempt from levy and sale in this State, for each head of a family, for a homestead, at least fifty, and if he had ten children, one hundred acres of land, without regard to value.

Shall it be said that a solemn constitutional provision, by which that exemption is modified, so as to give, instead of the fifty or one hundred acres, an exemption of real estate to the value of two thousand dollars is, as against debts existing before the modification was made, an impairing of the obligation of contracts and therefore void ?   Suppose, for argument's sake, that the doctrine of Marshall, Story, Taney, Woodbury, Swayne and Gibson is not correct.   Suppose that the construction put in the argument of this case at the hearing, upon the language of Judge Swayne, in Van Hoffman against the City of Quincy be correct, and that that Judge, in spite of his own express declaration to the contrary, in the very same decision, be understood to hold, that the remedies in existence at the date of a contract, enter into it, and cannot be altered so as to deprive the obligee of the right to sell anything which by the law of the State he might sell at the date of the contract ?   Suppose all this be true, even then, in my judgment, *this* law would not impair the obligation of *this* contract, would not lessen in the least the amount of the obligor's property, which, under the *contract,* was subject to the debt. What would that contract have been ?   " That all the property the debtor *might have* at the judgment should be subject to be sold, except such as was then exempt by law." Under the contract, by the laws then in force, it was in the power of every head of a family to acquire and hold exempt from levy and sale, at least fifty acres of land, worth *any* price it might bring in the market.   It is notorious, that there was plenty of land worth, at that time, and now, fifty dollars per acre, even as farming land, and under that same law, there was no limit on the value of the homestead.   It might be worth one dollar per acre, and have on it a hut, or it might be worth fifty dollars an acre, and have upon it a palace.   Under the *contract* it was agreed that the debtor might, if he pleased, invest his means in such a homestead, and hold it exempt from sale.   Can a law, providing that *every* head of a family shall hold exempt two thousand dollars of real estate be an impairing of the obligation of a contract which, by its very terms, stipulated for a homestead, which, if the debtor *pleased,*

Hardeman *vs.* Downer.

*might be worth even more than this?* A debtor who happened, at the date of the judgment, or rather at the date of the levy, to reside in a town, was, it is true, limited in his homestead to the sum of five hundred dollars, but the larger portion of our people, indeed four-fifths of them, reside in the country, and by the very terms of the contract we have supposed, (to-wit: a contract incorporating the exemption law of 1841 as a part of it,) the value of the homestead *was without limit.* To some of our citizens in all parts of the State, and to all of them in some parts, the present homestead is actually a less exemption than they would be entitled to under the Act of 1841; and there is not a debtor in the State who might not, if he pleased, and had the means, obtain, under that law, at least as great an exemption as is provided for under the Constitution of 1868. Now it is no unfair assumption, supposing the parties to a contract under the old law, contracted with reference to its provisions, to hold, that the creditor took the contract with the understanding that it was subject to be met by as large an exemption as it was possible the debtor *might, under the law, acquire.* They contracted for a homestead of any value. Is it a violation of the obligation of the contract, so to modify the law, as to allow *all* an exemption not greater in value than each might, under the *contract,* acquire?

The old law was unequal and unfair. It made distinctions between country people and town people; it allowed a man with a fine house upon his land, or with valuable land, a greater exemption than it did a man whose land was poor, or whose house was of small value.

The homestead provision of the Convention of 1868 did not increase, at all, the amount in value of property, that under the law existing at the time *might* be held exempt by *any* debtor. It was but an equalization of the law and its provisions to all the people of the State, and, with average prosperity to the country, it is my opinion that in a very few years the law of 1841 will allow, in all the farming counties, a homestead of greater value than can be held under the Constitution of 1868. But it is not my judgment that the laws of a State, in which a contract is made regulating the

amount of property exempt from sale, are any part of the contracts that are made in that State. If this were so, they would follow the contract from State to State. A contract is a contract, and each State is bound to enforce it as it was made. A debtor who made a contract in California, where the homestead may be five thousand dollars, might claim it in Georgia, where it is but two thousand dollars, and a debtor from a State where it is but five hundred dollars, could not, in Georgia, set up his fifty acres of land and a mule under the Act of 1841.

It is contended, however, in this case, that the rights of these parties are fixed by the judgment, and that the Homestead Law divests a vested right, and is therefore void. It is well settled that it is no violation of the Constitution of the United States for a State to pass a law divesting a vested right, provided that right is not vested by the *contract* of the parties. Satterlee vs. Mathewson, 2 Peters, 380; Watson vs. Mercer, 8 Peters, 88; Charles River Bridge vs. Warren Bridge, 11 Pet., 420; Baltimore & Susquehanna R. Road Co. vs. Nesbit, 10 How., 395; Carpenter vs. Pennsylvania, 17 How., 456. Such laws, it is true, are not favored, and the Constitutions of most of the States prohibit them, but the law now claimed to be void is a part of the Constitution of this State, and besides there is not in the Constitution of 1868 any provision denying to the Legislature the power to divest vested rights, or to pass retroactive laws. The Constitution of the United States, which prohibits *ex post facto* laws by States, as construed by all the Courts, has reference only to penal laws, (see the cases cited above,) and the Supreme Court has so uniformly held. In the case of The Society for the Propagation of the Gospel vs. Town of Paulet, that Court held that it was even competent for a State Legislature to deprive the plaintiff in ejectment of the right he previously had to recover mesne profits in a suit in ejectment for land: 4 Peters, 480.

2. But I am strongly inclined to think that the present Homestead and Exemption Law, as it is called, stands upon a stronger ground than ordinary exemption laws, and that

Hardeman *vs.* Downer.

the *contract* between the *debtor* and *creditor* has, in fact, nothing to do with it. It is not contended that under the contract a creditor acquires any lien upon the property of his debtor. He may still sell it, mortgage it, or waste it. He may contract a subsequent debt, which reduced to judgment, may take superior lien upon it, or the debtor may, if he please, sell it to a creditor of a year, to the entire exclusion of a creditor of five years. Now the Constitution of 1868 gives to the *debtor* no rights at all as against his creditor. It is expressly provided that the property exempt shall be secured to the *separate use* of the wife and family. The exemption is only to *heads of families,* and the statute passes the title out of the debtor, and vests it in the wife and children. It ceases to be the property of the husband. He loses all title to it. At the death of the wife it goes to her children. In plain words, this law is not for the benefit of the debtor at all. It shows him no favors. It does not interfere at all between *him* and the creditor. Here are two classes of claimants upon the debtor ; one class has his written obligation to pay a specified sum of money ; the other class has no written promise to pay, but the debtor, by the law of the land, is under a legal obligation to give to them a reasonable support according to his condition of life. I do not allude to the moral or natural duty which one is under to his wife, but to the legal obligation cast upon him by the express law of the land. By the common law, the husband was under legal obligation to give to his wife a reasonable support. It is true there was at common law but a poor remedy furnished the wife to enforce this obligation. Under certain circumstances a Court of Equity would grant this to her, but at law there was no way to compel the husband even to furnish her with the necessaries of life, but for her to contract a debt for them, which the law compelled him to pay. Our Code, section 1747, expressly says : " The husband is bound to support and maintain his wife." If the husband and wife voluntarily separate, or if the husband desert her, under section 1736 of the Code, she may sue him for alimony and recover a judgment against him, which is a lien upon his prop-

erty, and, as to this, she is precisely upon a footing of any other judgment creditor. Whilst they live together her remedy is under the Homestead Law. The Act of 1841, as well as the Code, sets apart the exemption to the separate use of the wife, the title of the husband was divested, the property became the property of the wife. She was expressly authorized to sue for trespasses upon it, and at her death it went to her children. And this was the law at the date of the contract on which the judgment in this case is founded. The husband was bound by the law to furnish to the wife a reasonable support. If they separated, she might sue him and recover that reasonable support as a debt. If they lived together, she might bind her husband for necessaries, or she might have the homestead and exemption of personalty (or he might for her) set apart to her use. The true question, therefore, is not between the creditor and the debtor, but between two creditors of the debtor, the creditor by contract and the creditor by statute, and the proper matter for inquiry is, does the constitutional clause forbidding the passage of a law impairing the obligation of contracts, prohibit the State from giving to the wife a better and a larger remedy for her *legal* rights than she had before? In other words, is it a violation of the Constitution of the United States for a State to pass laws giving preference to one set of creditors over another set, when at the date of the contract no such preference existed? Is it a portion of every contract that the obligee shall continue until he is satisfied to stand upon equal footing with all creditors who, by the law, are not preferred to him at the date of the contract? This direct question came before the Supreme Court of the United States in the case of Harrison vs. Sterry *et al.*, 5 Cranch, 289, 302. In the distribution of a bankrupt's effects, by the Act of March 3d, 1797, the United States claimed a priority over certain other creditors, by virtue of the Act of 1797, providing that debts due the United States should be first paid. These creditors were foreign creditors, and it was contended that as, by the law of the place of the contract, no such preference existed, the Act of 1797 was not to be so construed as to

give the United States a preference as against them. Chief Justice Marshall, in delivering the opinion of the Court, says: "The law of the place of a contract is, generally speaking, the law of the contract. But the right of priority forms no part of the contract itself. It is extrinsic, and is rather a personal privelege, dependant on the law of place where the Court sits or the property lies. In the familiar case of the administration of a deceased person's assets, they are distributed according to the dignity of the debt, as regulated by the law of the place where the representative of the deceased acts, and from which he derives his powers, and not by the law of the place of the contract. Cranch, 598, 599. What difference is there in principle between a priority given by the law of the place of execution, contrary to that given by the law of the *place* of the contract, and a priority given by a law of the *time of performance*, different from that given by the law of the *time of the contract?* If either the right of priority or equality is in the contract, then a physician's account for services during a last illness, would have preference or not according to the place of the contract. So, too, in the familiar case of statutes of distribution of deceased men's effects. Who has ever contended that the preference given by law to one class of creditors over another was a violation of the obligation of the contracts not preferred? Here is a man in Georgia who has a judgment against A, binding all his property, and having a preferred claim against all his effects. A, even after the date of the judgment, contracts a trust debt, and dies insolvent, the lien of the judgment is *divested*, and the trust debt steps in and takes the preference. The right of preference, or the right of equality, is not a part of the contract, though it may or may not be the law at the date of the contract. It is a regulation of the remedy, made often, to carry out the great public interests of the State. So, too, this Court in the case of *State vs. Dickson*, 38th Ga., 171, decided that the Act of the Legislature of this State, placing the Western & Atlantic Railroad on the footing of the State, as to its debts, gave it a preference, even as against debts then existing. And in the case of

*Embry & Fisher vs. Clapp*, 38th Ga. R., 245, at the last term of this Court, we held that the Act of the 24th of February, 1866, permitting a failing debtor to prefer one creditor to another, was a valid law, although, at the date of the several contracts, this could not have been done.    All such provisions 'are regulations based upon the public policy of the State, and have reference not to the contract of the parties, but to what the State, for its own purposes of public policy, deems best for the public weal, and may be altered at pleasure, whenever the State, in its wisdom, shall see fit to do so.    Who would say that it is not competent for a State Legislature, even as against past debts, to give to a wife one-half instead of one-third of her husband's realty at his death, as her dower, or to provide, even as against existing creditors, for a reasonable support to the family for a proper period.    Yet if this right to priority or to equality exists by the contract this could not be done.    So, too, in this case.    The *law* gives to the wife, from the husband, a reasonable support, and it is competent for the Legislature, in this way, to give her a remedy, one, too, which shall give her a preference over other creditors.    For these reasons, therefore, I am of the opinion that the Constitution of 1868, providing for a homestead, is only a regulation of the remedy, and is not an impairing of any right, express or implied, secured to creditors then existing by their ordinary contracts.

3.  It will moreover be observed that the judiciary, even of the Supreme Court of the United States, has no legislative powers.    In the enforcement of this clause of the Constitution of the United States, they can only do so by holding the law complained of void.    They cannot make a law to give a remedy.    If, when the law complained of is declared void, no remedy in fact exists, the judiciary is powerless to help the case.    If the remedy is lost in any way, other than by the " passing of a law," the evil is beyond the reach of the Courts, since they can only reach it by declaring the " law " unconstitutional and void.    If a new State, for instance, in the organization of its Courts, should fail to create any Court with jurisdiction to hear and give judgment upon contracts,

there would be no "Act" for the Courts to hold void. It would require affirmative legislation to meet the case, and that is beyond the power of the Courts. If a State should meet in convention and abolish all its Courts, and set up new Courts, and provide in the system no Court with power to enforce certain contracts, and the old Court having the power should give way, disappear, and no judicial organization be left with power to enforce the particular contracts alluded to, all remedy would be gone, and it would not be in the power of any Court to cure the evil. If the old Court were still in existence, the judiciary might hold that the " law" depriving it of its jurisdiction was void, and that it might still enforce the contracts for which the new organization furnished no remedy. But if the old Courts have disappeared the judiciary has not the power to correct the evil. Its power is only negative. It may declare a particular law void, and if, when that is done, a remedy exists for the contract, well and good, but if, after the legislation is held void, no remedy exists, the judiciary has exhausted its resources, the evil can then only be cured by legislation. And just this is the state of the case in Georgia. The old judiciary system of the State went by the board in the revolution that, in 1861 to 1865, swept over the land. The judiciary system of 1868 is the creation of the Constitution of 1868, and has no powers except such as it gets *under* that Constitution. It does not get any of its powers from the system that was in existence in 1861. That system, with all its jurisdiction, lies buried in the vortex, where also lie thousands of our people, and three-fourths of the prosperty of the State.

So far as civil organization is concerned, in fact when the Convention of 1868 met, there was none. The machinery in operation was military, and the Courts only had such powers as it saw fit to permit to them. The organization was merely provisional, and the Superior Courts of this State, as they now exist, hold all their powers under the Constitution of 1868. That Court, it is true, is, by that Constitution, clothed with power to perfect the judgments of the old Courts, and execute them, but it is with the express exception of such

matters and cases as are not prohibited by the new Constitution to the Courts. The Constitution of 1868 gives no general jurisdiction to any Court. The Superior Court has the largest jurisdiction, and is the first Court whose jurisdiction is defined. It has exclusive criminal jurisdiction of certain cases. It has jurisdiction over cases respecting title to land, and in divorce and equity cases, and in all other civil cases, "except as herein after provided." Article 5, section 3. The Constitution then erects other jurisdictions, confers upon them certain jurisdiction, and has also the homestead exception, which declares "that no Court or ministerial officer in this State shall have jurisdiction or authority to enforce any judgment against the property so set apart." Nothing can be plainer than that it was the intent of the Convention of 1868 not to give jurisdiction to the Courts to enforce a judgment against the homestead which it provided for. Such is the express language used, and should this or any other Court declare the Superior Court, or any Court set up by that Convention, to have the jurisdiction, it would be an act of legislation. It is not the case of a law taking away from a Court already in existence a jurisdiction it has had, but it is the failure, in setting up the new Court, to confer upon it the jurisdiction necessary to enforce this judgment against the homestead. If the right to sell this property under the judgment *is a right* secured by the contract, and it is a violation of the Constitution of the United States to take it away by legislation, which I do not by any means admit, I reply that the power to enforce it was not taken away by legislation, but by revolution, or if it existed even after the revolution, by the Act of Congress, of March 3d, 1867, which declared there was not in Georgia any legal civil government. If the power was taken away by any legislation it was not by the State, but by Congress. In other words, the case before us is not the case of passing a law, but of failing to pass one, not of taking away a remedy, but of failing to give one, not of violating the obligation of contracts, but of failing to furnish a means of enforcing them. There is simply no machinery to do it, no Court with power over

the matter, and neither this Court nor the Supreme Court of the United States, can set up a Court, or confer upon any Court now existing, a power it never had, and which was in fact denied to it in express terms. The evil, if it be one, cannot be cured by the judiciary. Its power of declaring a law void would not meet the case. The thing required is positive legislation, and that no Court has power to undertake.

4. But perhaps there is a stronger view of this question yet. The Constitution of 1868 was made under peculiar circumstances. A revolution had just swept over the land, destroying, in its progress, the civil government of the State in all its departments, and leaving the State unrepresented in the Congress of the United States. The State was without civil government, in anarchy, and the Congress of the United States, under a special clause of the Constitution of the United States, (to wit: Art. 5th, Sec. 4th,) which clothes it, under the circumstances existing, with the power, undertook "to guarantee to the State a republican government." The Constitution of 1868 is the result. It was made under a law of Congress, by direction of Congress, under the eye of Congress, and after it was made, and agreed to by the people of Georgia, under the direction of Congress, it was specially, and by solemn Act of that body, agreed to by the United States. A law of Congress, of June 25th, 1868, declared the Constitution of 1868 such a Constitution as under certain conditions therein mentioned, Congress would accept as providing a civil government of the State. The Constitution of 1868 is a compact on the part of the United States. It is an adjustment of the political relations between the State and the United States, which had been disturbed by the revolution. It was the settlement of a great political problem, a treaty of peace after a terrible war. It was the exercise, on the part of both the State and the United States, of the very highest political powers in each in final settlement and adjustment of the most serious complications. One of its terms, for instance, was that a portion of the proposed Constitution should be formally exscinded from that instru-

ment. Another of the terms was, that slavery should be prohibited, and certain guarantees made to certain classes of voters ; and another, that the State should agree to a certain amendment to the Constitution of the United States. All this the State of Georgia has done, and the Congress, for the United States, agreed that the Constitution of 1868 should go into operation as the Constitution of the State.

5. That *Constitution*, by the power which is vested in the people of Georgia, and by the power of every kind which is vested in the Congress of the United States, declares that no Court in this State shall have jurisdiction to enforce a judgment against the homestead. This special clause was one of the material terms of the adjustment. In the judgment of many, the people of Georgia would never have agreed to the adjustment had it wanted this provision.

There is no doubt but that Congress may, if it please, in the exercise of any of its powers, pass a law impairing the obligation of contracts. This provision does not apply except to the States. Evans vs. Eaton, Pet. C. C., 322. The Constitution of 1868 is an Act of Congress. Congress has agreed to it. This agreement was in the exercise of one of the very highest of its political prerogatives, to wit: the guaranteeing to a State, whose government had gone to wreck in a revolution, a new government. It is the exercise of the political powers of the United States in the adjustment of some of the most delicate questions and gravest complications which have ever occurred in the history of the country. According to the views of some of our gravest statesmen, the whole reconstruction policy is based upon that clause of the Constitution which authorizes Congress to suppress insurrections, that, as to Georgia, where the whole people were declared in insurrection, where the lines of the State were declared by Act of Congress to include only enemies, the whole Constitution of the United States, as to us, was suspended, or rather merged into that clause which authorizes Congress to suppress insurrections, and that the Reconstruction Laws, with the Acts and proceedings thereunder, are but the closing up of the suppression of the great insurrection.

Hardeman *vs.* Downer.

The Constitution of 1868 rightly or wrongly, rests upon the authority of the United States. It is not simply an Act of the State, and if this Court, or any Court, holds the homestead clause void it will hold an Act of Congress void. Nor is the particular law now complained of, even upon the mere footing of an Act of Congress, under its general power to make laws. It is a part of an adjustment of the very gravest political complications, and is the exercise by Congress, not of its mere legislative power, but of its political jurisdiction in adjusting the terms of settlement between Georgia and the United States, of the very highest political complications.

5. For myself, I do not see how it is possible to read the homestead clause in the Constitution, and for a moment hesitate to understand that it is retroactive. It must be remembered that the framers of that instrument conceived of themselves, as making a new government, erecting new Courts, and defining with precision what duties the said Courts and officers should perform, and what powers they should have. And the language used is that no Court or ministerial officer shall have jurisdiction or authority to *enforce any* judgment, execution or decree against the property so set apart. "Any judgment, of any date, from any Court." The language is universal. Such, too, was the understanding of the Convention, and of the people at the time. So fully was this understood, that Mr. Akerman, perhaps the best lawyer in the Convention, and one thoroughly at one with the general policy of the Convention, as appears by the journal, formally announced, when the whole instrument came to be voted upon, that he could not vote aye, because of the relief clause, and *because of the retroactive effect of the homestead provision.* See Journal of Convention.

6. Some stress was laid in the argument upon the last exception in the homestead provision, "for the removal of incumbrances." A judgment, it was said, was clearly an "incumbrance," and it was argued, that under the very terms of the law, authority was given to sell for the removal of incumbrances. At most, it was argued, the language is

ambiguous, and will bear that construction as well as any other.

There is not, to my mind, the least ambiguity, and any. obscurity from the use of the words, "removal of incumbrances," only arises from a hasty reading of the clause, and not taking this phrase in connection with the other language. The language, "removal of incumbrances," like the other exceptions, is to be read in connection with the words, "no Court or ministerial officer shall ever have jurisdiction to enforce any judgment, execution, or decree against the property, except"—what? Except a judgment, execution or decree, *founded upon a debt* due, for taxes; a judgment, execution or decree founded on a debt due for the purchase-money, etc., or a judgment, execution or decree founded on a debt due, (contracted) for the removal of incumbrances.

Each of the exceptions was an incumbrance, there might be others—the land might have upon it an incumbrance of a widow's dower, or some friend to prevent it from being sold, may, at some time, have paid up a judgment that, as the law stood, was about to sell it. The intent was to put the person who relieved it from such incumbrances upon the same footing as was the party in whose hands the incumbrance was. The debt thus contracted was a sort of purchase-money for the land, since it was only by the debt thus contracted that there was any land left to take a homestead out of. To my mind this is the clear and undoubted meaning of the phrase, and indeed it is only by adding after the words, "judgment, execution or decree," the words, "founded on a debt due or contracted," that *any of the exceptions make good sense*, since a judgment for the removal of an incumbrance would be nonsense, unless it were a decree for the performance of an act, and not a judgment, at all, for money. The sentence, when complete, taken in any fair sense, would read, "except a judgment, execution or decree, founded on a debt contracted for the removal of incumbrances," and if this, which I think is only giving a fair and reasonable construction to the language, be done, the meaning is plain. If one hold a debt which was contracted for the purpose of removing an incum-

Hardeman *vs.* Downer.

brance from the property, the Court and ministerial officers have jurisdiction to enforce such a judgment.

Judgment affirmed.

BROWN, C. J., concurred as follows:

1. The same propositions which are announced in the case of *Shorter vs. Cobb*, as to the denial of jurisdiction to the Courts of this State, to enforce debts for slaves, or the hire thereof, are equally true and applicable to that part of the new State Constitution which secures to each family a homestead, and declares that no Court or ministerial officer shall ever have jurisdiction or authority to enforce any judgment, decree or execution against the property so set apart, except for taxes, etc., as therein excepted. This denial of jurisdiction applies as well to judgments, decrees and executions rendered *prior*, as subsequent, to the adoption of said Constitution.

2. Amidst the general wreck of fortunes and destruction of rights, caused by the war, the State, by her Convention, called, as required by Congress, to form a new State government, had the right to propose this measure to the conquering government, which had the power to approve and sanction it, as a means of equalizing losses to some extent, and of retaining and inviting population, by securing to each family a home, free from old liens, which were expected by both debtor and creditor to have been satisfied by property which was swept away by the deluge of destruction, which reduced an opulent and proud people to poverty, and drove them to the verge of despair.

3. In this state of things the homestead measure was a necessity; and its adoption was dictated by sound public policy, to save a large class of intelligent, patriotic citizens and their families from despondency, by placing it in their power again to become useful members of society, and by honest toil and the exercise of frugality and economy, to maintain a competency, if not to acquire, even in a greater degree, the comforts of life.

4. Sound public policy required the adoption of this meas-
ure as part of the terms upon which the State was to be
readmitted to her rights in the Union, to prevent monopolies,
and the reduction of a large majority of her population to a
condition of bankruptcy and vassalage.   While rights and
property of every other description had been lost or destroyed
by the war, to have held that judgments, mortgages, etc., in
the hands of note-shavers and money-lenders were the only
property that had been *insured* by the government, and that
they were too sacred to be touched, and to have made no ar-
rangement, with the assent of Congress, in readjusting the
*status* of the State, to prevent the sale by the sheriff of the vast
extent of territory in the State covered by these old liens, at
a time when there was very little money in the State with
which to pay debts or to purchase property, would have re-
sulted in the sacrifice of the lands of the State under the
sheriff's hammer and their purchase by a few wealthy per-
sons and companies, which would have built up a landed
aristocracy more lordly and controlling, and much more ex-
acting and oppressive, than ever existed under the old slavery
system.   The Convention had a right to propose a remedy,
and Congress had a right to interpose and sanction a Consti-
tution which prevented this great public wrong.   In the
plenitude of its power over the conquered State, Congress
did so; and it acted justly and wisely in so doing.  ·

5. That part of the Constitution of this State which denies
to the Courts jurisdiction to. enforce any judgment, execu-
tion, etc., against the homestead, does not 'violate the tenth
section of the first article of the Constitution of the United
States, as the said State Constitution was formed under the
dictation and control of Congress, as the representative of
the conquering government, and is the act of Congress, be-
cause it derives its validity from the sanction of Congress,
and not from the free choice or consent of the State; and it
matters not whether the part of the State Constitution now
under consideration was dictated by Congress, or proposed by
the Convention, and accepted and approved by Congress, the
legal effect is the same, as the whole instrument was invalid

and of no force till it ,was approved by Congress ; whose power is not limited by said section of the Constitution of the United States.

6. It is not the business of the Courts to inquire whether the homestead is larger than was actually necessary.   That was a question for the consideration of the Convention which proposed the measure, and for the decision of the Congress which approved and ratified it.

7. The word "incumbrances," in the 1st section of the 7th article of the Constitution of this State, is not to be construed in its broad legal sense, and to embrace *all* judgments, decrees, mortgages, and executions.   To say that no Court or ministerial officer in this State shall ever have jurisdiction or authority to enforce any judgment, decree or execution against said property so set apart as a homestead, *except* that they may enforce all "incumbrances thereon," which means any and all judgments, decrees and executions which may at any time exist against the same, is to say that the Convention and the Congress were guilty of the absurdity of denying jurisdiction in all such cases by the body of the act, and restoring it by the *proviso* or exception, which is contrary to all true rules of construction.

8. We are to construe this part of the Constitution in connection with the whole instrument, when we are attempting to ascertain what the law-givers meant.   Taking the whole together as proposed by the Convention, all jurisdiction was denied to the Courts to enforce any judgment, execution, or decree rendered upon any contract made prior to the 1st June, 1865, except in certain excepted cases.   Now, it seems quite clear, after this denial of jurisdiction, that they did not intend, by the use of the word "incumbrances," in the section now under consideration, to restore the jurisdiction in all cases where it might authorize the sale of the homestead, the protection of which was one of the special objects of their labor and care.

WARNER, J., dissenting.

It appears from the record in this case that Hardeman, the plaintiff in error, had obtained a judgment against Downer, the defendant, that an execution had issued thereon, which was levied on Downer's land for satisfaction thereof, that Downer claimed a homestead in the land under the first section of the seventh article of the Constitution of 1868, which declares, that " each head of a family, or guardian, or trustee of a family of minor children, shall be entitled to a homestead of realty to the value of two thousand dollars in *specie,* and personal property the value of one thousand dollars in *specie,* both to be valued at the time they are set apart. And no Court, or ministerial officer in this State, shall ever have jurisdiction or authority to *enforce* any judgment, decree, or execution against said property so set apart, including such improvements as may be made thereon from time to time, except for taxes, money borrowed and expended in the improvement of the homestead, or for the purchase-money of the same, and for labor done thereon, or material furnished therefor, or removal of *encumbrances thereon."*    It is admitted in the record that the plaintiff's judgment is of *older date* than the constitutional provision above cited, securing to the defendant a homestead in his property ; that the defendant has not sufficient property to satisfy the plaintiff's judgment, besides the land claimed as a homestead ; and *the* question presented for our consideration and judgment is, whether that provision of the State Constitution is a *valid law* as against the plaintiff's *prior* judgment debt ?    How stood the law of this State as to the exemption of property of a judgment debtor from levy and sale, at the time the plaintiff's contract was made, and at the time he obtained his judgment thereon against the defendant ?    The 2013th section of the Code declares that the following property of any debtor who is the head of a family, shall be exempt from levy and sale under the laws of this State, (to-wit:) " fifty acres of land, and five additional ones for each of his children under the age of sixteen years, the land to include the dwelling house, if the

Hardeman *vs.* Downer.

same and improvements, does not exceed two hundred dollars, one farm horse or mule, one cow and calf, ten head of hogs, and fifty dollars worth of provisions, and five dollars worth additional for each child, beds, bedding and common bedsteads sufficient for the family, one loom, one spinning wheel, and two pairs of cards, and one hundred pounds of lint cotton, common tools of trade for himself and his wife, equipments and arms of a miltia soldier and trooper's horse, ordinary cooking utensils and table crockery, wearing apparel of himself and family, family Bible, religious works and school books, family portraits, the library of a professional man in actual practice or business, not exceeding three hundred dollars in value, to be selected by himself." It is a *significant fact* that these several exemption laws, passed at different times by the Legislature and embodied in the Code, were enacted to operate *prospectively* so as not to interfere with *past contracts*, as may be seen by reference to the original Acts.

If there could have existed any doubt as to the *vested legal right* of the creditor to recover his demand from the debtor *before* judgment, there certainly can be none *after* judgment. "Final judgments are such as at once put an end to the action, by declaring that the plaintiff has either entitled himself, or has not, to recover the remedy he sues for." 3d Bl. Com., 398. "A contract of record is one which has been declared and *adjudicated* by a Court having jurisdiction, or which is entered of record in obedience to, or in carrying out the judgments of a Court." Revised Code, section 2674. "A judgment, (says Blackstone,) in consequence of some suit or action in a Court of justice, is frequently the means of *vesting the right* and property of chattel interests in the prevailing party. And here we must be careful to distinguish between property, the *right* of which, is before vested in the party, and of which only *possession* is recovered by suit or action, and property to which a man before had no determinate title, or certain claim, but he gains as well *the right* as the *possession* by the process and *judgment of the law.* Of the former sort, are *all debts,* and *choses in action ;* as if a man

gives bond for twenty pounds, or agrees to buy a horse at a stated sum, or takes up goods of a tradesman upon an implied contract to pay as much as they are reasonably worth; in all *these cases* the right accrues to the creditor, and is *completely vested in him*, at the time of the bond being sealed, or the contract, or agreement made; and the law only gives him a remedy to recover *the possession of that right* which already, in justice, belongs to him." 2d Bl. Com., 436. If the right of the creditor to recover his debt from the defendant was a vested right at the time the contract was made, according to the general principles of the law, much more was it a *vested right* in the creditor, when he had obtained a judgment on that contract, *conclusively* establishing his legal right to recover the amount specified therein, and which judgment, under the law of this State, *bound the property* of the defendant for *its payment.* The judgment creditor in this case had a *vested right under the law*, to have and recover the amount of his judgment debt out of *the property* of the defendant, which was not exempt by the laws of the State at the time the contract was made, for his judgment created a *lien* upon *that property.* Can this provision of the Constitution have a *retroactive* operation, so as to defeat and destroy *that vested legal right* of the judgment creditor? It is a fundamental principle, that all laws should be made to commence *in futuro*, and be notified before their commencement, which is implied in the term *"prescribed."* 1st Bl. Com., 46. The Revised Code, which was recognized and adopted by the Constitution of 1868, declares that "laws prescribe only for *the future;* they cannot impair *the* obligation of contracts, nor generally have a *retrospective* operation." The Code took effect as the public law of this State on the first day of January, 1863, and declares, that "All *rights*, or *obligations*, or *duties*, acquired or imposed by *existing laws* shall remain *valid* and *binding*, notwithstanding the *repeal* or *modification* of such laws." See sections 2 and 6 of the Code. It is a well settled principle of the Common Law, as ancient as the law itself, that a statute cannot be construed so as to have a *retrospective* operation, and thereby divest or destroy a *vested legal*

*right.* Gilmore vs. Shuter, 1st Shower, 17 ; Couch vs. Jeffries, 4th Burrows' Rep., 2460 ; Dash vs. Van Kleeck, 7th John. Rep., 477. In the case of Dash vs. Van Kleeck, Mr. Justice Thompson said : " It is repugnant to the first principles of justice, and the equal and permanent security of rights, to take by law the property of one individual, without his consent, and give it to another. The principle contended for on the part of the defendant inevitably leads to, and sometimes sanctions such a doctrine. For if the plaintiff can be deprived of *his remedy already vested,* with equal propriety, might he be compelled to refund the money, had he actually received it." The principle would be the same in this case. If Downer, the defendant, had paid Hardeman, the plaintiff, the amount of his judgment debt, he might, with equal justice and legal propriety, claim the right to have the money so paid by him refunded back, as to claim the legal right to have *his property,* which was *bound* for its payment, *withdrawn* from the reach of the plaintiff's *legal process,* and appropriated to his *own use and benefit as a homestead.* The plaintiff has the same *legal right* to subject *the property* of the defendant claimed as a homestead to the payment of his judgment, as he would have had to retain *the money,* if it had been paid to him by the defendant.

In Wilkinson vs. Leland *et al.,* (2d Peters' Rep., 654,) Mr. Justice Story, in delivering the opinion of the Court, says : " We know of no case in which a legislative Act to transfer the property of A to B, without his consent, has ever been held a constitutional exercise of legislative power in any State of the Union. On the contrary, it has been constantly resisted as inconsistent with just principles by every judicial tribunal in which it has been attempted to be enforced." In *Wilder vs. Lumpkin,* 4th *Georgia Rep.,* 204, this question was fully and carefully considered by this Court. After examining the fundamental principles of the common law, and the decisions of the Courts based thereon, this Court held and decided that *retrospective* laws, which divest previously acquired rights, (although such as are not within the prohibition of the Constitution impairing the obligation of

Hardeman *vs.* Downer.

contracts,) are upon the same position, as to principle, with *ex post facto* laws, and if enacted by the Legislature, will not be enforced by the Courts, and are void, because in conflict with the *fundamental principles* of our Government. It would be a mere waste of time to attempt to illustrate more clearly and satisfactorily the fundamental principles of the law, as applicable to *retroactive* legislation, than is furnished in the report of that case. The Constitution of 1868, in which this homestead provision is found, declared and adopted certain *fundamental* principles for the government of the people of this State. The first section of the first article of the Constitution declares that "protection to person and *property* is the paramount duty of government, and shall be *impartial and complete.*" The fifth section of the fifth article of that Constitution declares that "the right of the people to appeal to *the Courts* shall *never be impaired.*" The twenty-sixth section of the first article of that Constitution declares that "laws shall have a general operation, and no general law affecting *private rights* shall be varied in any particular by *special* legislation, except with the *free consent, in writing,* of all persons to be affected thereby."

In view of the fact that the fundamental principles of the common law before cited, as well as the provisions of the Code, (which were recognized and adopted by the Constitution of 1868,) forbid *retrospective* legislation, and in view of the further fact, that to take the property of one man, without his consent, and give it to another, and deny him *all remedy in the Courts,* is in violation of the fundamental principles as declared by that same Constitution, I am reluctant to believe that such gross and flagrant injustice was intended to be done by the first section of the seventh article, which makes provision for a homestead, and, therefore, we ought, as a Court, in *all decency,* to presume that it was *not intended* by the framers thereof to have a *retrospective* operation, but be only applicable to such judgments as might be obtained on contracts made *after its adoption.* But a majority of this Court hold that the words "any judgment" are broad enough to include judgments obtained *before,* as well

Hardeman *vs.* Downer.

as *after*, its adoption, and thus *nullify* and *destroy* the judgment creditor's vested legal rights altogether. The practical effect of the decision of a majority of the Court is to *confiscate* the judgment creditor's property and vest it in the defendant as *his homestead.* There can be no doubt that the judgment creditor had a *vested legal right* to have his debtor's *property* appropriated to the payment of *his debt*, and which, in honesty and fair dealing, justly belonged to him, but under the construction given to the Constitution by the majority of the Court, *that property* is taken from the judgment creditor, *without his consent*, and vested in *the debtor*. To give to the first section of the seventh article of the Constitution a *retroactive* operation so as to include judgments on contracts made prior to its adoption, then, it is *ex post facto* in its character, and is violative of the fundamental principles of the social compact, as was held by this Court in *Wilder vs. Lumpkin*, before cited, and ought not to be enforced by the Courts.

But if it was intended to embrace judgments on contracts made *prior* to its adoption, as the majority of this Court holds, then this provision of the State Constitution is in violation of the tenth section of the first article of the Constitution of the United States, which declares that "no State shall pass *any law* impairing the obligation of contracts." Although the Constitution of a State is its fundamental law, still it is a *law of the State*, and if any of its provisions *impair* or *destroy* the obligation of *existing* contracts, it is as much within the prohibition of the Constitution of the United States as any *other law of the State*, and to that extent is null and void. The first section of the seventh article of the Constitution of 1868, not only *impairs* the obligation of contracts made prior to its adoption, but in all cases where the debtor's property does not exceed in value the sum of three thousand dollars in specie, it *destroys* that obligation by the denial to one of the contracting parties *all remedy* for its enforcement under the laws which existed *at the time the contract was made.* In this case, the record discloses the fact that the defendant has not sufficient property to satisfy the plaintiff's judgment, besides the land claimed as a home-

stead. In the 44th number of the Federalist, Mr. Madison denounced laws impairing the obligation of contracts as among those not only *violating the Constitution,* but contrary to *the first principles of the social compact,* and to every principle of sound legislation. In the case of the Planters' Bank vs. Sharp *et al.,* (6th Howard's Rep., 319,) the Legislature of Mississippi had passed a law prohibiting the bank from transferring, by indorsement or otherwise, any note, bill, or other evidence of debt, and declared that if it should appear in evidence, upon the trial of any *action,* upon any such note, bill, or other evidence of debt, that the same was transferred, the same shall *abate* on the plea of the defendant, and *the* question in the case was, whether this Act of the Legislature which deprived the plaintiff, who sued upon a note made *prior* to the passage of the Act, and transferred by the bank, of *all remedy* to collect it, was within the constitutional prohibition against impairing the obligation of contracts. Mr. Justice Woodbury, in delivering the opinion of the Court in that case, says: "When every form of redress on a contract is taken away, it will be difficult to see how the obligation of it is *not impaired.* If any right or power be left under the note by this Act after a transfer is made, it is of no use where it cannot be enforced and no benefit derived from it, but an action abated *toties quoties,* as often as it is instituted. In the mildest view a *new disability* is thus attached to an *old contract,* and its value and usefulness restricted, and these of course *impair it.* One of the *tests* that a contract has been impaired is, that its *value* has, by legislation, been *diminished.* It is not, by the Constitution, to be *impaired at all.* This *is* not a question of degree, or manner, or cause, but of encroaching in *any respect* on its obligation, dispensing with *any part of its force."* Again the learned Judge says, at page 328, "but where future acquisitions are attempted to be exonerated, and the discharge extended to *the debt* or *contract itself,* if done by the States, it must not as here apply to *past contracts,* or it is held to impair their obligation. Congress alone can do this as to *prior contracts,* by means of an express permission in the

Constitution to pass uniform laws on the subject of bankruptcy, which laws may, in *that way,* be made to reach *past obligations."* Again, at page 330, "And if in *professing* to alter *the remedy only,* the *duties* and *rights* of the contract itself are *changed* or *impaired,* it comes just as much within the spirit of the constitutional prohibition. Thus, if a remedy is taken entirely away, as here, or clogged by condition of any kind, the right of the owner may indeed subsist, and be acknowledged, but *it is impaired;* and *the test,* as before suggested, is not the *extent* of the violation of the tract, but the fact that in truth its obligation is *lessened,* in however small a particular, and not merely altering or regulating *the remedy alone."*

In the case of Curran vs. The State of Arkansas *et al.,* (15th Howard's Reports, 304,) the constitutionality of the legislative Acts of the State of Arkansas were considered and adjudicated. The suit was instituted by a billholder against the Bank of the State of Arkansas to recover the value of the bills of the bank held by him. The State was the *sole* owner and stockholder of the corporate funds of the bank. Subsequently to the issuing of the bills held by the plaintiff, the Legislature of that State passed an Act by which a portion of the specie funds of the bank were appropriated to pay the members of the Legislature. Other Acts were passed appropriating the funds and property of the bank to the *use of the State,* whereby it became insolvent, and *the* question was, whether the State Legislature had the constitutional power to pass these several Acts, and whether in doing so the obligation of the contracts made with the billholders was *impaired thereby.* Mr. Justice Curtis, who delivered the opinion of the Court in that case, says, "The plaintiff was the bearer of bills of the bank, by each of which the bank promised to pay him on demand a certain sum of money. Of course these payments were to be made out of *the property* of the bank. By the laws of the State existing when these contracts were made, their bearer had *the right,* by legal process, to *compel* their performance by the levy of an execution on the goods, chattels, lands and tenements of the bank.

Such were these contracts and their *obligations*, and it would seem to require no argument to prove that a law authorizing and requiring such a corporation to distribute its property among its stockholders, or transfer it to its *sole* stockholder, leaving its bills unredeemed, would *impair* the obligation of the contracts contained in those bills." Again, at page 312, the Court say: "In our judgment a law distributing the property of an insolvent trading or banking corporation among its stockholders, or giving it to strangers, or seizing it *to the use of the State,* would as clearly *impair* the obligation of its contracts as a law giving to the heirs the effects of a deceased natural person to the exclusion of *his* creditors would impair the obligation of *his* contracts." Again, on page 319, the Court say: "If this law had only contained the first section, vesting the real property of the bank in the State, and providing *no remedy* by which this complainant, as a creditor of the bank, could reach it, we think it would have *impaired* the obligation of *his* contracts. True, it does not touch the right of action against the bank, it only *withdraws* the real property from the reach of *legal process,* and thus affects *the remedy.* But it by no means follows, because a law affects only *the remedy* that it does not *impair* the obligation of the contract. The obligation of a contract, in the sense in which those words are used in the Constitution, is *that duty of performing it* which is recognized and *enforced by the laws.* And if the law is so changed that the means of *legally enforcing this duty* are materially impaired, the obligation of the contract no longer remains the same. This has been the doctrine of this Court from a very early period." See Van Hoffman vs. The City of Quincy, 4th Wallace Rep., 550, to the same point. According to the fundamental principles of the law, as stated by Blackstone, the judgment creditor in this case had an *absolute vested legal right* to recover the amount of his judgment debt out of *the property* of his judgment debtor, and under our law, that judgment *bound* his property for *its payment,* created a *specific lien upon it for that purpose.* This homestead provision in the Constitution of 1868 *withdraws* that property from the reach of legal pro-

Hardeman *vs.* Downer.

cess to satisfy that judgment debt, which the Supreme Court of the United States, in Curran vs. The State of Arkansas, before cited, expressly decide cannot be done without a *violation* of the Federal Constitution.

The cases decided by the Supreme Court of the United States, in regard to laws impairing the obligation of contracts, were fully examined and reviewed in the case of *Aycock et al., vs. Martin, 37th Ga. R.*, 124, and in my dissenting opinion in the case of *Cutts & Johnson vs. Hardee, 38th Ga. R.*, 381. The legal propositions asserted and enunciated by the majority of the Court, in the case last cited, are directly in *conflict* with the decisions of the Supreme Court of the United States, to which reference has already been made; indeed, they would seem to be, from a careful examination of them, *wholly irreconcilable.* Perhaps the decision of the majority of this Court in *Cutts & Johnson vs. Hardee*, should be entitled to the *greater weight*, in expounding the Constitution of the United States, if it was not for the fact, that the decisions of the Supreme Court of the United States are *binding authority* upon the State Courts, on *that question.* Whatever may have been said in the several cases decided in the Supreme Court of the United States, from Fletcher & Peck, down to the case of Van Hoffman vs. the City of Quincy, in 4th Wallace, in regard to the power of States to legislate upon *the remedy*, the judgments of that Court have been uniform, that no State law was valid which *invaded* any substantial *legal right*, which attached to the contract at the time it was made, and that if it *did* invade such *legal right*, it impaired the obligation of the contract within the true intent and meaning of the Constitution, whether it was done under the *pretext* of regulating the remedy, or otherwise. The majority of this Court, in *Cutts & Johnson vs. Hardee*, held, " that the State had the undoubted right to change, modify, or vary the nature and extent of the remedy, provided a *substantive* remedy is left to the creditor, so long as the State does not deny to her Courts jurisdiction of contracts." But in this case the State denies *all remedy* to the creditor, by denying to her Courts jurisdiction to enforce his judgment

against the property of the debtor. The reasonable conclusion would have been, that the majority of the Court, in accordance with their ruling in *Cutts & Johnson vs. Hardee,* would have held this law of the State, which denies *all remedy* to the creditor, *unconstitutional.*

But when there is *a will* to nullify this salutary provision of the Constitution, *some way* will be found to do it, and *that way,* on the present occasion, is to *assume* that Georgia was not a State in the Union at the time of the adoption of the Constitution of 1868; that the adoption and ratification of the Constitution of 1868, was the act .of Congress, and not the act of the State, and that, therefore, the tenth section of the first article of the Constitution which declares that, "no State shall pass any law impairing the obligation of contracts," has no application to Georgia as *a State.* When, and where, according to this *assumed* theory of the majority of the Court, did Congress derive the power to *repudiate* and *confiscate* the *lawful,* individual contracts of private individuals—their *private property.* If Georgia was not a State in the Union at the time of the adoption and ratification of the Constitution of 1868, what was she? If not a State in the Union at that time, when did she become so? The historical records of the country show, that on the 9th day of July, 1778, the State of Georgia became a member of "The United States of America," by the articles of confederation entered into on that day, that on the 17th day of September, 1787, the State of Georgia, for the purpose of forming a more *perfect Union* than that which then existed between the States, *voluntarily* entered into an executed irrevocable compact, which is familiarly known as "The Constitution of the United States." The State of Georgia then, ever since the adoption and ratification of the Federal Constitution, has, and does now, constitute an integral part of the political sovereignty of the Government of the United States of America. It is true, as stated by the majority of the Court, that the State of Georgia, in 1861, *attempted* to secede from the Federal Union, but it is equally true, that *she failed to do so.* My own views, as to the *legal* right of the State to secede from the Union, were

Hardeman *vs.* Downer.

fully expressed in the case of *Chancely vs. Bailey*, 37th *Ga. R.*, 532, and will not be again repeated here. It is said by a majority of the Court, that Georgia was a conquered State. If she was a conquered State, she was a conquered State *in* the Union, and not a conquered State out of the Union. Nor is it true, as *assumed* by the majority of the Court, that the Reconstruction Acts of Congress recognized the State as being *out* of the Union, but on the contrary, she is recognized as a State *in* the Union, without any *legal State Government*. But independent of all these considerations, the Convention of 1865 *repealed* the pretended Ordinance of Secession, which is supposed by some to have taken the State *out* of the Union, which repealing Ordinance of 1865 was expressly re-adopted and confirmed by the Convention of 1868. So that there was no pretext for saying, that the State was *out* of the Union at the time of the adoption of the Constitution of 1868, by reason of the pretended Ordinance of Secession, for that had been *repealed*. Besides, it is provided in the 11th paragraph of the 11th article of the Constitution of 1868, that Congress *might* accept the same with "any qualifications or conditions," and still the Government formed by it should nevertheless exist and continue as the Government of *this State*, which negatives the idea, that the adoption of the Constitution was *the act of Congress*, and not the *voluntary* act of the State Convention, which made and submitted it to Congress for acceptance, on the terms and conditions expressed therein. The Constitution of the United States is *the supreme law of the land*, and the State of Georgia, when she adopted and ratified the Constitution of 1868, was as much bound by its provisions as any other State in the Union, and if any one of the provisions of the State Constitution violate the *paramount law of the land*, the Courts are bound to declare such provisions contained therein, null and void. That the first section of the seventh article of the Constitution of 1868 does violate the tenth section of the first article of the Constitution of the United States, which declares that, "no State shall pass *any law* impairing the obligation of contracts," when applied to the case of the judgment creditor as made by the record now

before the Court, is quite apparent. It comes clearly within the *mischief* which that prohibition was intended to remedy. In Sturgis vs. Crowninshield, 4th Wheaton, page 122, Chief Justice Marshall said, "The Convention intended to establish a great principle, that contracts should be *inviolable.* The Constitution therefore declares that no State shall pass "any law impairing the obligation of contracts." Those rules of construction, which have been consecrated by the wisdom of ages, compel us to say that *these words* prohibit the passage of *any law* discharging a contract *without performance.* In that same case the Chief Justice said, "it was not necessary, nor would it have been safe, had it even been the intention of the framers of the Constitution, to prohibit the passage of all insolvent laws, to enumerate *particular subjects* to which the principle they intended to establish should apply. The principle was the *inviolability* of contracts. This principle was to be protected, in whatsoever *form* it might be assailed. To what purpose enumerate the *particular modes* of violation, which should be forbidden, when it was intended to *forbid all ?*" An *obiter dictum* of Chief Justice Taney, in Bronson vs. Kinzie, 1st Howard's Rep., 315, has been relied on in support of the right of a State to pass exemption laws affecting *past contracts.* But when we examine the qualifying expressions contained in the latter part of the opinion, at page 321, it cannot fairly be presumed that the Chief Justice intended to sanction that doctrine to the extent which is claimed. "Mortgages, (says the Chief Justice,) made *since* the passage of these laws, must undoubtedly be governed by them, for every State has the power to prescribe the legal and equitable obligations of a contract to be made and executed within its jurisdiction. It may exempt any property it thinks proper from sale for the payment of a debt, and may impose such conditions and restrictions upon the creditor as its judgment and policy may dictate. And all *future contracts* would be subject to *such provisions,* and they would be obligatory upon the parties in the Courts of the United States, as well as those in the State." In the State of New York, at a time when the laws were faithfully

Hardeman *vs.* Downer,

and ably administered there, the case of Quackenbush vs. Danks was decided, in which it was held, that statutes not in terms retrospective, should not be construed to effect *past* transactions, especially where such construction would work injustice; and that an Act to exempt certain property from distress and sale on execution, does not affect executions for debts contracted *before* its passage; but, if the Act admits of that construction, it was held to be in conflict with the provision of the Constitution of the United States, forbidding a State from passing *any law* impairing the obligation of contracts.   1st Denio's Rep., 128.   Although this case is not binding authority upon this Court, it is cited for its sound reasoning and inflexible adherence to the fundamental principles of the law as applicable to the *inviolability* of contracts. In the case now before us the plaintiff's rights under his judgment, are not only *impaired* by this law of the State, but are *destroyed* by the denial of *all remedy* to enforce the same against the property of the defendant.   In other words, this provision of the State Constitution, according to the construction given to it by the majority of the Court, *discharges* the plaintiff's contract *without performance*, which Chief Justice Marshall says, in Sturgis vs. Crowninshield, the Constitution of the United States *prohibits*, and that those rules of construction, which have been consecrated by the wisdom of ages, *compelled that Court* to say so.   Inasmuch as the first section of the seventh article of the Constitution of 1868 (as expounded by the majority of this Court,) denies jurisdiction to the Courts of the State to enforce any judgment, execution or decree against the property of the defendant set apart as a homestead, founded or obtained on contracts made *prior* to the adoption thereof, it is repugnant to the Constitution of the United States, and therefore *void*.   The Superior Courts of this State have jurisdiction to enforce such contracts conferred upon them by the third section of the fifth article of the Constitution of 1868.   By that section *exclusive* jurisdiction is given to the Superior Courts in cases of divorce, in cases respecting titles to land, and equity cases; and said Courts shall have jurisdiction "*in all other cases*," except as herein-

after provided. The *exception* as to the homestead, as provided in the first section of the seventh article, being *void*, as to contracts made *prior* to its adoption, as has been already shown, it follows that the Superior Courts have jurisdiction to enforce the plaintiff's contract against the property of the defendant, under the laws of the State, as the same existed at the time the contract was made, it being one of those " civil cases " of which the Superior Courts have jurisdiction, by the third section of the fifth article of the Constitution of 1868. The first section of the seventh article of that Constitution, so far as the same relates to *prior* obligations and contracts being void, so far as it denies jurisdiction to the Courts to enforce *them*, the general jurisdiction conferred upon the Superior Courts " in all other civil cases " is not taken away or defeated thereby, and the Superior Court has jurisdiction to enforce such contracts, as provided by the laws of the State *at the time such contracts were made.* This ruling is in accordance with the fundamental principles of the Constitution of 1868, as *expressly declared therein,* that " protection to person and *property* is the paramount duty of Government, and shall be *impartial and complete."* Can it be said that protection to property is *impartial* and *complete,* when the property of one man is taken from him, and given to another, without his consent, and *all remedy* denied him to enforce his legal rights? Again, it is declared to be one of the fundamental principles in the Constitution of 1868, that " the right of the people to appeal to the Courts *shall never be impaired."* How far, and to what extent, the plaintiff's right to appeal to the Courts has been *impaired* in this case, under the decision of the majority of the Court in construing the first section of the seventh article of this same Constitution, the record furnished the most *conclusive evidence.*

But it has been said that a great necessity existed, growing out of the results of the war, which would justify and sanction the violation of these great fundamental principles of government and constitutional law. Those who make this assertion should always remember that both creditor and debtor were *equal sufferers* by the calamities of the war. The

framers of the Federal Constitution had just emerged from a seven years' war, and well knew the evils which resulted therefrom, and the general demoralization of society, in regard to performing their contracts. If we may believe the contemporary expounders of that Constitution, one of the main objects of those who framed it was to provide against and prevent the very state of things which is now attempted to be carried into effect by a majority of this Court. When they declared that "no State shall pass *any law* impairing the obligation of contracts," and required the members of the legislative, executive, and *judicial officers* of each State, to be *bound by oath* to support it, they thought they had accomplished their object. It has been *practically* demonstrated, however, that they were entirely *mistaken*. This statement is made without any "*pharisaical pretensions*," but simply because it is *the truth*. It has been said that "history repeats itself." It is a well known historical fact that a certain portion of the records of this State were *publicly burnt* with fire drawn from heaven. I have labored to the best of my ability to preserve and protect the records of this Court from a similar fate in *the future*. My object has been to *faithfully* perform my constitutional obligations to God and my country, and to keep my judicial record *untarnished*. These are the "*incentives*" which prompted me to dissent from the judgment of the majority of the Court in *Cutts & Johnson vs. Hardee,* and which now prompts me to dissent from the judgment of the majority of the Court in this case. I am of the opinion that the judgment of the Court below should be reversed.