## Asa Moore v. W. H. Letchford.

1. The first section of the act of November 9, 1866 (General Laws of 1866, p. 118), enacted that "whenever final judgments *shall be* rendered in any court of record of this State, said judgment shall become a lien on all the real estate of the judgment debtor situate in the county where the judgment is rendered." *Held*, that by this enactment a judgment which had been rendered previous to its passage, as well as those rendered after it, operated a lien upon the defendant's real estate situate within the county where the judgment was rendered; and the retroactive effect of the statute in this respect does not render it obnoxious to the constitutional inhibition of laws impairing the obligation of contracts. (Ogden, J., dissenting.)

2. After the passage of the act of November 9, 1866, a judgment rendered in July, 1861, though never recorded in the county clerk's office, took lien upon the defendant's real estate within the county; and if the stay law of November 10, 1866, hindered the plaintiff from obtaining execution, the lien of his judgment was not lost. (Ogden, J., dissenting.)

3. Laches is not imputable to a party while his legal remedies are sus-
   pended, or have been taken away by the supreme power of the State;
   and it is immaterial whether the legislation depriving him of his
   remedies be constitutional or unconstitutional.

4. See the opinion of Mr. Justice Ogden, for the reasoning and authori-
   ties on which he dissents from the principal rulings in this case.

APPEAL from Nacogdoches.    Tried below before the
Hon. M. Priest.

The material facts of the case are stated clearly and
connectedly in the opinion of the court.    The instruc-
tions given to the jury by the district judge will be
found in the argument of the appellant's counsel.

*Richard S. Walker*, for the appellant, insisted that
the first section of the act of November 9, 1866, con-
ferred a lien upon judgments rendered while the act of
1860 was in force, as well as judgments rendered sub-
sequent to the former enactment.    After criticising the
language of the act, and comparing its several provis-
ions with each other at some length, he proceeded as fol-
lows :    After establishing the main proposition, that
the appellant's judgment was included within the bene-
fits of the act of November 9, 1866, it remains to in-
quire whether its status at that date was such as to ex-
cept it from the ordinary rule entitling judgments ren-
dered before that date to have a lien in the county
where rendered.    Whether, by reason of any act of
appellant's of omission or commission, there existed at
said date any legal cause why his said judgment should
not have a lien.    The charge of the district judge
placed before the jury insuperable reasons to defeat the
attachment of said lien at that period, or at any subse-
quent date.    The law propounded in the charge was
as follows :

" Previous to the act of 1860, a judgment creditor, in

order to preserve and continue his lien, was required to sue out execution within twelve months from the rendition of judgment, or his lien would be lost.

"In 1860 the Legislature of Texas changed this rule, and instead of the issuance of execution, the act of 1860 required judgment creditors to have their judgments recorded in the office of the county clerk, and by this act liens were preserved.

"In 1866 this act was repealed, and the rule was again changed. By the terms of the act of 1866, judgment creditors, on judgments thereafter rendered, had their liens secured by virtue of the judgment, without any act, on all the real estate of the defendant situated in the county; provided that such lien would be lost on failure to sue out execution within twelve months from the first day that an execution could be sued out by law.

"This law of 1866 was an enlarging statute, providing for the record of judgments in other counties, thus extending the plaintiff's lien over the real estate of defendant in other counties. This provision applies as well to judgment creditors before the passage of the act, as to subsequent judgment creditors. The law of 1860 gave the right to creditors to preserve their lien in the county in which the judgment was rendered, and if their lien, thus provided for, was not preserved, it was because of their own neglect. If they suffered their judgments to become dormant under pre-existing laws, they had their remedy to revive.

"The law of 1866 revives no judgments nor laws.

"It is for you to determine, from the evidence, whether the plaintiff had a judgment; whether he preserved his lien, if he had any, by recording the judgment in the office of the county clerk, as required by law, or whether he, by his own neglect, lost his lien, as

provided by the act of 1860. You will also determine whether plaintiff, if his lien was lost under the act of 1860, revived his judgment, so as to revive his lien, at any time before defendant's judgment was recorded in Nacogdoches county, or before the levy and sale of defendant and Johnson under their executions. If you find that plaintiff had not lost his lien by failing to record as required, or that he revived his judgment and lien, in some mode prescribed by law before the rights of defendant accrued, you will find for the plaintiff.

"As it is required only of those who obtain judgments, after the passage of the act of 1866, to sue out executions, within twelve months after executions could be sued out, the stay law becomes immaterial in this cause, but it having been declared unconstitutional by the Supreme Court, it cannot be made available for any purpose. If you believe, from the evidence, that defendant acquired title to the property in controversy by purchase, as alleged, while plaintiff had no existing lien upon it, and before the levy and sale of plaintiff, you will find for defendant."

Much of the charge, it is seen, is devoted simply to giving a summary or abstract of the state of legislation concerning the modes merely by which liens on real estate were acquired, presented as mere abstract propositions, alike applicable to any case.

The portion of the charge which is complained of, misconceived the purport and effect wholly of the act of 1860, and laid the basis for that train of errors which pervaded the entire charge in respect to nearly, or quite every legal proposition contained in it, causing false issues to be presented to the jury on every question which it was their province to decide. To begin, the court said that "the act of 1860 *required* judgment creditors to have their judgments recorded in the office

of the county clerk, and by this act liens were *preserved*. The law of 1860 gave the right to creditors to preserve their liens in the county in which the judgment was rendered, and if their lien, thus provided for, was not preserved, it was because of their own neglect. If they suffered their judgments to *become dormant* under the pre-existing laws, they had their remedy to revive. The law of 1866 revives no judgments nor liens."

The charge then proceeds upon the foregoing tests, to submit to the jury whether the plaintiff has preserved his lien under the act of 1860, and if not, that he must have revived his judgment (on the assumption, of course, that it was dormant) before defendant's judgment was recorded, in order to entitle him to recover. Now, in the first place, the court utterly misconceived the act of 1860, in supposing that it (as did all the other acts from 1839 to the present time) gave any lien whatever by virtue of a judgment; merely to preserve a lien, implies the previous existence of a lien. The charge implies that a lien existed, which was to be preserved by recording; that recording the judgment was required by the law, in order to prevent the judgment from becoming dormant; and that such failure to record resulted in the loss of the lien. The plain, simple statement of, or rather reference to, the act of 1860, refutes all of those propositions. The predominant idea apparently in the mind of the court was, that the plaintiff or judgment creditor was required to act, and failing to do so, the judgment became dormant; that inaction was, in the words of the charge, neglect; the effect of which was dormancy of judgment; and that the dormancy prevented the judgment from taking lien under act of November 9, 1866, unless the same should be afterwards revived. The court, however, does not inti-

mate within what period the judgment creditor was, under the act of 1860, required to act, or record his judgment. Indeed, it would involve a curious search to find in the act anything to indicate when the judgment should be recorded, for as the law does not require, but only permits it, for the plaintiff's own advantage, it graciously allows him to forego his privilege just so long as he is willing to jeopardize his own interest, by allowing others to record their judgments in advance of him. He may record his judgment whenever he pleases (the act containing no limitation as to time), or not at all. The language of the act has already been quoted; a recurrence to it will show that it simply declares that no judgment shall have a lien until recorded, without any restriction as to time when a judgment creditor may exercise his right. That law gives no lien without a recording by plaintiff, but this law (that of 1866) is just the reverse; it does give lien "whenever final judgments are rendered," etc. So far as concerns the matter of the judgment becoming dormant, the act of 1860, which has already been quoted, was enacted with special reference to the inconvenient mischiefs existing under the previous laws. Under the acts of 1839 and 1840, which required executions to be issued in a consecutive chain, within twelve months of each other at least, (Arts. 3053, 3954, Paschal's Digest; and see Towns v. Harris, 13 Texas, 515 ; Graves v. Hall, 13 Texas, 379; Scott v. Rose, 1 Texas, 508; Hall v. McCormick, 7 Texas, 269), inconvenience, perplexity and confusion resulted ; besides, the system induced constantly and unprofitably increasing bills of costs, in order to preserve the lien. The issuance of executions was indispensable. The failure to issue within a year caused the judgment to become dormant. It was to remedy these evils that the act of 1860 was passed. This

is obvious, not less from the body than from the title itself of the act.    The title is, "An act to prevent judgments from becoming dormant, and to create and preserve liens;" and in thorough accordance with the intention as expressed in the title, the act proceeds to declare that parties interested may have executions and judgments at their instance (formerly the clerk was required to issue after judgment one execution); and it proceeds to declare further that judgments "shall not become dormant unless ten years shall have elapsed between the issuance of executions." The doctrine of the dormancy of judgments being founded, at common law, on the presumption of payment or satisfaction after the lapse of a year and a day from the issuance of execution, the statutes of 1860 extended the period of time to ten years after the issuance of an execution.    If no execution issued at common law within a year, possibly it would be likewise presumed that the judgment was satisfied, and by analogy it may be equally true, notwithstanding the letter of the statute of 1860, that the same presumption would exist under that law at the expiration of ten years from date of judgment, in case no execution had in the meantime issued. (Aulanier v. Franklin, 1 Texas, 75 ; Ross v. Duval, 13 Peters, 64, similar principle held.)    In any event, however, as ten years is the shortest period within which a presumption of satisfaction would exist, it seems quite clear that by no possibility could a judgment rendered in 1861, have become dormant on the ninth of November, 1866.    The judge, in his charge, attributes the dormancy to the failure to record the judgment before the last named date, which I have shown, I hope, is a total misconception of the whole scope of the act, and militates against the very object which the Legislature had in making the law.    If then, the plaintiff was not required to issue

execution in order to keep alive his judgment, nor required to record his judgment, it certainly could not have been dormant, and for the judge to submit that hypothetical case to the jury, if the views of the appellant are correct, was of course a vital error, for which the judgment must be reversed and cause remanded.

During all the period of the war, after the expiration of the six and one-half months stay of execution, the stay laws continually in force during the war, Governor Hamilton's proclamation or orders, the stay law of 1866, constantly forbid the issuance of executions; and whether they were constitutional or not, as regards their prohibitions to enforce the collection of debts, yet acquiescence in their provisions did not create a presumption of the satisfaction of the judgments. Those laws and orders by implication, and even expressly, preserved the vitality of judgments, and dispensed with the necessity of acts of diligence through the issuance of executions; and were constitutional laws, in respect to their provisions, either expressed or implied, which contemplated the preservation of the validity and vitality of judgments or liens. The law involved in this case does not require the successful maintenance of the proposition just made, based as it is on the hypothesis that the issuance of execution had been essential to keep alive plaintiff's judgment; for, as has been shown, the law did not require it, and further even, it positively dispensed with it—the purpose of the law had specially in view the abolition of the previous system. But even had it been required by the act of 1860 to issue execution, the subsequent legislation would, as plaintiff contends, for the reasons just stated, have saved his rights intact.

Then the appellant conceives that at the date of the

passage of the act of 1866, there existed no legal reason why his judgment should not have been a lien on the real estate of Hardeman and Barrett in Nacogdoches county, as against all subsequent encumbrances (subject, nevertheless, to the liens of prior registered judgments rendered in said county). The plaintiff, of course, claimed no lien under the act of 1860. Yet the judge's charge speaks of another hypothetical case, viz.: the possibility of the plaintiff (after November 9, 1866, it must be supposed the court meant) "reviving his judgment and his lien, in some mode" (without suggesting, however, what constituted that mode) prescribed by law, before the defendant's rights accrued." Revive a judgment that was never dormant? revive a lien which had never existed? Although the court has not been felicitous, perhaps, in the employment of legal terms to convey legal ideas, it is probable that his Honor meant to assume (which would be charging on the weight of evidence, and assuming facts which the jury only could decide) that the judgment was dormant by the failure to record before November 9, 1866, and that nevertheless he could afterwards revive the judgment by *scire facias*, and from the date of revival it would take lien in the county. Now, did the plaintiff then have a cause of action on *scire facias?* Certainly not; he could not allege a state of facts presenting a *prima facie* case of dormancy; and the court would have been constrained to have sustained a demurrer to such a proceeding. If the grounds heretofore presented are correct, no further answer need be given to this branch of the charge. The rulings of the court thus far have been against the plaintiff, and were decisive against him before the jury, as shown by the verdict. Yet the court proceeded to state another prop-

13—xxxv

osition which was favorable to the interest of the plaintiff's case, viz., " That it is required only of those who obtain judgments after the passage of the act of 1866, to sue out executions within twelve months after executions could be sued out," and therefore that the plaintiff was not required to use that diligence. The appellant hopes that that view may be concurred in ; for if that proposition be true, there remains nothing further to be said on any other point in the case. If the appellant has sustained the points thus far presented, by the law, then, if no execution were required to be issued by judgment creditors on judgments obtained before the act of 1866, in order to preserve their liens, it follows, that the plaintiff's execution and sheriff's deed are conclusive in his favor.

But the plaintiff's case does not rest the result of the case upon the vindication of the correctness of the last stated proposition. He contends that if the law of 1866 required of him, as well as of judgment creditors since the passage of the act, to issue execution " within a year from the first day upon which such execution can by law be issued thereon," that he fully complied with that requirement. The time when it may or shall be issued is not fixed by the date of the judgment, but is a question of law. When was that time, as contemplated by the Legislature which enacted the law ? The intention of the law-maker is that which the court seeks to discover and give effect to. The judicial mind, in exploring for that intent, is first struck with the peculiar, out-of-the-way expression used to indicate a period of time. The act of twenty-sixth of January, 1839, (Article 3953, Paschal's Digest,) and the act of fifth of Februry, 1840, (Article 3954, Paschal's Digest,) and all other acts on similar subject matter in other States, employ the same language, viz., a given time (e. g.,

twelve months) from the date of the judgment; but the language of the proviso above quoted, is not merely peculiar, but is studiedly qualified—it is not "from the date of the judgment," or from any other initial point of time, but "from the first day upon which," etc., as above.

We naturally seek for a reason for the departure referred to, from language and terms germain ordinarily to the subject, and which would be most natural, certain and definite, if the object were to establish a rule of time applicable and definite alike to all judgments. At the same time that said act was passed, the Legislature had before it an act, known commonly as the "Stay Law," concerning the collection of debts, providing for judgments, executions, etc., and regulating and restricting the issuance of executions by installments, and suspending and delaying their issuance for specified terms of one, two, three and four years, according to the classification of the different kinds of debts and judgments. The act referred to was passed at the same session, and on the day after the act regulating liens, etc., viz: tenth of November, 1866. These two acts being read together, harmonize and consist with each other, and the aptness of the language of the proviso is apparent, and no other language would have been adequate. In a word, the proviso most manifestly meant that the execution need issue in one, two, three, or more years, just according to the facts of a given case under the provisions of the stay law. That law enacted "that on all judgments rendered prior to the first day of January, 1867, the judgment debtor shall have twelve months thereafter within which to pay to the plaintiff, his agent or attorney, one-fourth part of said judgment, and all costs of suit; and that no execution shall

issue thereon until the expiration of the time aforesaid, except in like cases, and under like circumstances authorizing the issuance of attachments, in which case execution may issue for the entire amount of such judgment." The same section proceeds to provide for the debtor twenty-four months from said first day of January within which to pay one-third of the remainder of the judgment, with similar stay of execution, during said period, and so on, extending the period to forty-eight months, or four installments of one year each, during which time no execution can issue, if the judgment debtor pays as therein provided.

Whether the stay law was either in whole or in part unconstitutional, is not material in this connection. The Legislature clearly had a constitutional right to allow liens to continue definitely or indefinitely, on conditions, or without conditions, so that no rights, under the Constitution of this State or of the United States, were infracted; and inasmuch as the stay law fixed one year as the shortest period within which an execution could issue on judgments of this class, therefore the expiration of that year, to-wit, November 10, 1867, was exactly the period of time fixed by the Legislature from which the year would commence to run, within which the plaintiff would be required to issue execution, in order to prevent his lien from ceasing and becoming inoperative. The act of November 9, 1866, either fixed some time by construction of law or none at all; and the true and legal view undeniably is, that the time intended by them is the true time, and it is immaterial where or from what source we obtain that information, whether it be from an almanac, the calculation of eclipses, or an unconstitutional law.

*F. B. Sexton*, for the appellee.—It is quite apparent that the question, who has the better title in this case, must be answered by determining which of the judgments above referred to had or took lien upon Hardeman's property in Nacogdoches county; or, if both, then which was prior in time and law.

I respectfully submit, first, that the judgment of Moore v. Hardeman & Barrett, rendered in the District Court of Nacogdoches county, on the sixth of July, 1861, with a stay of execution till the first of February, 1862, never had or took any lien whatever upon the property of Hardeman. In support of this, I observe that the act of the fourteenth of February, 1860 (Paschal's Digest, 3963), which was in force when this judgment was rendered, provides that "No judgment hereafter rendered shall operate as a lien until filed in the office of the county clerk of the county court where the same is rendered, for registration." It must be borne in mind that a lien is given wholly by statute. It did not exist at common law. Being in derogation of the common law, the statutes providing for and regulating it must be strictly construed. The acts of twenty-sixth of January, 1839, and of fifth of February, 1840, were both repealed by the act of the fourteenth of February, 1860, and one of the purposes of that act is declared in its title to be, "to create and preserve judgment liens." No word of stronger import than create could well have been used. It places beyond doubt that, in the view of the legislative mind, no such thing as a lien theretofore existed. The Legislature, believing the existence of a lien to be necessary and proper, proceeded to create it. They provided that a certain effect and consequence (called a lien) should thereafter attach to a judgment, upon compliance with certain conditions by him or them most directly inter-

ested in its enforcement.    Compliance with these conditions is a constituent part of, or rather a pre-requisite to, the existence of a lien.    So careful has the Legislature been in this regard that they have used a negative form of expression, prohibiting the bringing of the lien into being until after the happening of a certain event. They say, "No judgment hereafter rendered shall operate as a lien until," etc.    This view of the effect of this statute seems, to my mind, so clear as to render further argument unnecessary.    It follows that Moore, having failed to record his judgment, could not enforce it by execution against property which had been sold and conveyed before his execution was issued.    In further support of this view, I submit some authorities, part of them being decisions of courts in other States, upon statutes similar to ours, and part of them decisions of our own Supreme Court.

"In Mississippi, under the statute of 1841, which provides that a judgment lien shall not attach to property out of the county in which it is rendered, until an abstract of the judgment is filed with the clerk of the circuit court in the county in which the property may be situated, where several judgments are rendered in one county, and executions issued to another without filing abstracts of the judgments, the execution first coming to the hands of the sheriff, and levied, has a priority, although issuing on a younger judgment." (Gresham v. Roberts, 2 Smedes & Marshall, 471.)

"Where an act is prescribed to be done as a condition precedent to the the attaching of a judgment as a lien, there is no lien until that act is performed.    In a trial of right of property, therefore, between a judgment creditor and a claimant, it cannot affect the right of the claimant that he had notice of the judgment, if the condition to its attaching, as a lien, had not been

performed at the time when the claimant's right accrued." (Tarpley v. Hamer, 9 Smedes & Marshall Reports, 310.)

In the case of Scroggin v. Perry, decided by this court at the Tyler Term, 1869 (32 Texas, 31), the court, after citing the acts of fourteenth of February, 1860, and ninth of November, 1866, and referring to their provisions, says : "Since the plaintiff did not record his judgment, it did not operate as a lien ; and since the intervenors did record their judgment, and thus acquire and preserve the lien on all the real estate of the Pacific Railroad Company in the county of Harrison, they are to be preferred to plaintiff." This seems to me to be decisive of this case.

I think it is clear that the judgment of Moore v. Hardeman & Barrett gave no lien under the law (the act of fourteenth of February, 1860) in force when it was rendered. It was maintained in the court below that the act of ninth of November, 1866 (see Laws of Eleventh Legislature, p. 118), which, by its language, refers altogether to judgments which "shall be rendered," gave a lien to this judgment, which was rendered on the sixth day of July, 1861, about five years and a half before the passage of the act, and has not yet been recorded in the county of its rendition. I understand it to be an elementary rule in the interpretation of statutes that no law can have an effect previous to its passage ; that no law can create, enlarge, modify or restrain rights in existence before its passage. The judgment of Moore v Hardeman & Barrett, considered with reference to this statute (the act of November, 1866), was as a common law judgment—it had no lien. The Legislature has not said that judgments then rendered, or then in existence—especially has it not said that dormant judgments (as this then was, and in regard to which

somewhat more will be said hereafter), shall have a lien; but it has said "that whenever final judgments shall be rendered by any court of record of this State, such judgment shall ;be a lien on all the real estate of the judgment debtor," etc.   It is obvious that the Legislature was providing for cases that should arise in the future.   It does not dispense with any conditions which it had previously imposed in order to give liens to judgments previously rendered.   It provides merely that for the future it shall not be necessary, in order to give a lien to a judgment in the county of its rendition, to have it recorded in that county.   It does not offer a premium to the negligent and slothful who have failed to comply with the positive requirements of former laws.   It changes the law for the future, not for the past.

There is another view of this case which seems to me to render the construction of the statute of the ninth of November, 1866, as contended for, impossible.   A judgment is defined, in the elementary books, to be a contract of record.   If this be correct, and I presume it will hardly be controverted, can, under the provisions of the Constitution of the United States, or of the Constitution of this State, the Legislature change or impair the obligations of that contract?   The judgment, when rendered, and under the laws then in force, created certain rights, duties and obligations between the parties to it.   Can the Legislature change those rights, duties and obligations?   I maintain that a lien is not a necessary part of the remedy.   The effect of a common law judgment is well understood.   It was simply "*quod recuperet.*"   It did not place any of the defendant's property in pledge or mortgage.   The defendant could sell or convey any of his property, real or personal, at any time

before a levy.  Do not let us, then, be misled by the sophism, that giving a lien to a judgment, affects the remedy only.  It is an addition to a judgment.  It gives it an effect it never before had.  It changes the obligation, duties and liabilities of the parties, and this the Legislature had no power to do.  In either of the views last stated, both of which are believed to be correct, the act of the ninth day of November, 1866, cannot give a lien to the judgment of the sixth day of July, 1861.

It was maintained, however, or attempted to be, in the court below, that unless the act of the ninth day of November, 1866, was made, by giving it a meaning not to be found in its language, to create a lien for judgments rendered before its passage, in the county where they were rendered, that absurd consequences would be produced; and judicial legislation was boldly invoked to prevent these consequences.  It was said that under the second section of the act, a party who had obtained a judgment before the passage of the act, could procure a copy of the judgment and have it recorded in any other county where the defendant had real estate, and it would, under that section, thereby become a lien upon that real estate, while the first section of the act did not give any such effect to judgments rendered before its passage in the county where they were rendered.  Such a consequence was declared to be absurd, and not to be attributed to the Legislature; and the court was asked, without pausing to consider whether the language of the act contained any such meaning or not, to declare that the Legislature meant, by the language of the first section, to give a lien to judgments rendered before its passage, in the county of their rendition.  This the court below very properly declined to do.  I have to say, in reply to the position

assumed there, and which I suppose will be relied on here also, that I understand it to be an elementary principle, that rules for the construction of statutes can never be invoked, unless there is an ambiguity in the statute asked to be construed. Is there any ambiguity in the language of the first section of the act of the ninth of November, 1866 ? Clearly not. The first, highest and best source to which to resort for the meaning of the Legislature, is what they have said. The duty of the judge is to declare, expound and enforce what they have enacted. The judge is not authorized to supply omissions of the Legislature. Nor is he authorized to say that any law is absurd or unjust because it may not correspond with his notions of reason or justice. The meaning of the first section of the act, now under consideration, is plain, and the judge below rightly decided that he had no authority to make another and different meaning for it.

"When the words used in the statute clearly express the will of the Legislature, courts are not at liberty to give a construction, changing the meaning and defeating the will of the law-making department. The courts cannot make laws; it is their province to expound them." (Thomson v. Buckley, 1 Texas, 35.)

"When the law is clear and explicit, and its provisions are susceptible of but one interpretation, its consequences of evil can only be avoided by a change of the law itself, to be effected by the Legislature, and not by judicial action." (Basley v. Mattingley, 14 B. Monroe, Ky. R., 89.)

"Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the Legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction." (Fisher v. Blight, 2 Cranch, 358.)

"The intention of the Legislature is to be searched for in the words which the Legislature has employed to convey it." (Schooner *Pauline* v. United States, 7 Cranch, 52.)

In the court below one or two paragraphs from Mr. Sedgwick's work on Statutory and Constitutional Law, were read, in which the author stated that judges were, in certain cases, authorized to construe a statute so as to give it an effect somewhat different to that which its words would import. This, as an abstract or general proposition, is not denied. The work of Mr. Sedgwick is not now accessible to me. I examined what was referred to at the time, and all that was said in connection with it. In all that the author says on the subject of judicial construction, he lays it down as a condition precedent that there must be ambiguity in the language used, before any rules of construction whatever can be resorted to. I refer with confidence to the work of Mr. Sedgwick as sustaining my view of this statute and the ruling of the court below. There is nothing in the act of the ninth of November, 1866, requiring extrinsic aid to ascertain its meaning. Suppose the Legislature had declared in so many words that judgments should not have a lien in the county of their rendition, but that if recorded in other counties, they should take lien. Will it be pretended that the Legislature had not power so to enact? If they had so enacted, could the judges have refused to give force to the act, or have declared the act not to be law, merely because they might think it to be impolitic, unreasonable or unjust? Certainly not.

In further support of the doctrine that the words of a statute are the best evidence of its meaning, and that where they are unambiguous, resort cannot be had to rules of construction, I refer the court to Newell v. The

People, 3 Selden, 97; Waller v. Harris, 20 Wendell, 555–557; Bartlett v. Morris, 9 Porter's Ala. R., 268.

"Arguments," says Judge Story, "drawn from impolicy or inconvenience, ought to have little weight. The only sound principle, is to declare *ita lex scripta est*, to follow and to obey; nor, if a principle so just could be overlooked, could there be well found a more unsafe guide or practice than mere policy or convenience. Men, on such subjects, complexionally differ from each other; the same men differ from themselves at different times." (Story's Conflict of Laws, 17.) To the same effect, see The Queen v. Justices of Lancaster, 11 Adolphus & Ellis, 157.

This ground, resting alone on judicial construction— which, according to my recollection, Mr. Sedgwick calls "judicial legislation"—was insisted upon in the court below with great earnestness. I submit it with the remark, that while it is a power which may be exercised in an extreme case, that all the text-writers, and all the adjudged cases I have been able to consult, concur in holding that it can be exercised in such a case only, and never in one where the words of the statute are free from ambiguity.

If it should be conceded, for the sake of argument alone, that the act of the ninth of November, 1866, gave a lien to the judgment of July 6, 1861, from the date of the passage of that act, even then I maintain that the appellant, Moore, did not take the necessary steps to preserve that lien; that he lost it by his own negligence, and that the lien acquired by the judgment rendered in the United States court in favor of Letchford & Co. v. Hardeman & Barrett, took priority over Moore's judgment, and rendered the land in controversy subject to levy and sale under the execution issued upon it (Letchford's judgment). Of course, it

will be admitted by all, that no lien by virtue of Moore's judgment of July 6, 1861, could, by any possibility, exist before the passage of the act of ninth of November, 1866. If any influence of that act is invoked, *all* its provisions must be taken together, including the proviso at the end of section one, which is in these words: "*Provided*, that said lien shall cease and become inoperative, if execution be not issued within one year from the first day upon which such execution can by law be issued thereon." Was an execution issued upon the judgment of Moore v. Hardeman & Barrett, rendered July 6, 1861, within one year from the ninth of November, 1866? Was any ever issued before the eleventh day of May, 1868, or did Moore take any steps whatever to procure or compel its issuance? Perhaps it may be as well for me to say here that I make no question with reference to the effect of the acts (called stay laws) of December 7, 1861, January 10, 1862, and December 2, 1863, all of which provide, in section five of each, "that during the time named in this act, or until otherwise provided by law, it shall not be necessary to issue executions, or writs of *venditioni exponas*, to prevent judgments from becoming dormant." It is immaterial whether they shall be held valid or void. I think, as a matter of opinion merely, that they ought to be held valid. But they have no application whatever to this case. If the judgment of Moore v. Hardeman & Barrett, of July 6, 1861, had been recorded in Nacogdoches county, and had, in the first instance, acquired a lien, then the aid of these last mentioned acts might well have been invoked as an excuse for not preserving it by a proper issue of executions. But, as to these acts, the judgment of July 6, 1861, had no existence. No lien was acquired by that judgment under the law in force when

it was rendered, and, of course, none was lost. "Nothing could be lost where nothing existed." Returning, then, to the question whether the lien of Moore's judgment, supposing one to have been acquired by the effect of the act of ninth of November, 1866, has been preserved, I submit that the act itself, in the proviso quoted above, positively requires execution to issue within a year, and punishes the failure by loss of the lien given in the first part of section one. This provision is common to all our acts on the subject of judgment liens. It is in the repealed acts of 1839 and 1840, and in the execution law of twenty-seventh of January, 1842. (Paschal's Digest, 3783.) It is in all the acts of the different States of the United States, relating to judgment liens, which I have been able to examine. This requirement is not affected by the third section of the act under consideration (ninth of November, 1866), that provides what shall be required, or rather what effect shall follow after the first execution has been issued. It does not dispense with the necessity of issuing the first execution within a year from the date of the judgment, or within a year from the first day upon which execution could lawfully issue. There is a remarkable unanimity of legislation, and concurrence of judicial decision in the American States, with reference to this provision requiring the issuance of execution within a year, in order to give the judgment the effect of a lien, or to prevent the enforcement of junior judgments or executions against the real estate of the defendant. I submit a few authorities on this point, which I have collected out of the vast number to be found in the reports. Some of them are adjudications in the courts of the United States, and some in the State courts :

"If an execution be not sued out within the year

from the rendition of the judgment, the lien created by
the judgment ceases to operate; and the plaintiff will
be required to resort to a *scire facias,* or an action on
his judgment." (Shepard v. Bailleul, 3 Texas, 26.)
The same point, under a later statute, is decided in
North v. Swing, 24 Texas, 193.

"In Ohio, a judgment is a lien on the lands of the
defendant within the county, if the execution issue
and is levied on it within the year.   But a judgment on
which execution does not issue within the year, consti-
tutes no lien against a subsequent *bona fide* judgment
on which execution is issued within the year.  The pur-
chaser under the judgment cannot be in a worse condi-
tion than the plaintiff who claims the purchase money
under a prior lien." (U. S. Bank v. Longworth, 1
McLean, 35.  See, to the same point, also, Thompson
v. Atherton, 6 Ham., 30, Ohio R.  See, also, Adams
v. Dyer, 8 Johnson, New York.)

" A judgment is a lien on land only while an execu-
tion may be sued out thereon; and in case the judg-
ment is afterwards revived, the lien of the judgment at-
taches only from the date of the judgment of renewal,
and does not relate back to the date of the original
judgment." (Combs v. Jordan, 3 Bland, 284; Post v.
Mackall, 3 Bland, 486 ; Cape Sable Company's case, 3
Bland, 606).

" If the elder judgment creditor suspends his execu-
tion, he loses his priority of lien; and a levy and sale
of property on a junior judgment will be regular, and
accrue to the benefit of such judgment.  The lien is
but a security, and must be pursued in good faith."
(Michie v. Planters' Bank, 4 Howard (Miss.) R.,
130).  This is the very case before the court.  Moore
suspended his execution, lost his lien, and cannot now
be heard to complain.

It is manifest that no execution was issued, or applied for, on the judgment of Moore v. Hardeman, until more than eighteen months after the ninth of November, 1866. So that, if everything claimed as the effect of that act be conceded, still the lien acquired under it was lost, and the lien of the judgment, rendered in the United States court in favor of W. H. Letchford & Co. v. Hardeman & Barrett, took effect; the land in controversy was bound by it; the land was subject to the levy; and the sale and conveyance made by the marshal, gave a good title to William H. Letchford, the defendant below, and appellee in this court.

I can conceive of no possible aspect of this case, in which the appellant would be entitled to recover. The first view submitted is, to my mind, conclusive. I think the judgment of July 6, 1861, never took lien. But, if it can possibly be held that the act of ninth of November, 1866, gave it a lien, then I maintain it was lost by failure to issue execution within a year. If it should be said that the act of November '10, 1866, entitled "An Act regulating the collection of debts," (Laws of Eleventh Legislature, p. 126), commonly known as the stay law, prevented the issuance of an execution, to that I answer, that law was unconstitutional, null, and void from the beginning, and has been so held by this court. If it be said that ministerial officers, such as the clerk of the district court, could not determine the constitutionality of legislative enactments, but must obey them as they stand on the statute books until their constitutionality is determined by the proper judicial tribunals, the reply to that is, that the way was open to the plaintiff, Moore, to compel the issuance of execution by *mandamus*. He did not do this. He did not apply for execution. He did nothing. In the language of the Supreme Court of

Mississippi, "he suspended his execution." He cannot now be heard to complain that a creditor of Hardeman & Barrett, under a junior judgment, rendered in the United States Court, by the exercise of superior diligence, has collected a portion of his debt out of property which he (Moore) might once have subjected to his own judgment. He would not record his judgment in the county of Nacogdoches, when it was first rendered. He would not apply for execution within the year. He must take the consequences of this double negligence. *Vigilantibus, non dormientibus leges subveniunt.*

WALKER, J.—In an action of trespass to try title, the appellant, Asa Moore, failed in the district court; the verdict and judgment were for the defendant, William H. Letchford. The lands in controversy were the property of Blackstone Hardeman and L. T. Barrett. The appellant claims under a sheriff's deed; the appellee by virtue of a deed from the United States marshal, and a conveyance from James B. Johnson, whose title is also by the sheriff. The appellee holds the older and better title to the lands in controversy, although acquired through a junior judgment, unless, upon an examination of the law of the case, it shall be found that the appellant's judgment held the lands bound by a prior lien. The contest is, then, between judgment creditors for priority of lien. Moore's judgment against Hardeman and Barrett was rendered on the sixth of July, 1861, with stay of execution till the first of February, 1862. Letchford's judgment dates from the ninth day of November, 1867. Johnson's judgment dates from the twentieth of August, 1867. The sale at which Letchford bought was made in April, 1868. Moore purchased at a sale made June, 1868. No

14—XXXV

further notice need be taken of Johnson's title, as it stands or falls with Letchford's, and is a part of it.

There is no question as to priority of judgment. The act of February 14, 1860, which had repealed the acts of 1839 and 1840, was in force when Moore obtained his judgment. So far as the provisions of that act influence the case, they are as follows :

1. Judgments under this act did not become dormant unless ten years should elapse between the issuance of executions.

2. No judgment rendered after the passage of the act operated as a lien on the lands of the judgment debtor, situated in the county where the judgment was rendered, until a transcript was filed for record in the office of the county clerk. The lien continued for four years, and could be kept alive by reinscribing within each succeeding quadrennial period. The issuance of execution was not a condition precedent to the lien. In examining the appellant's title, we do not look to this statute to determine whether he had a lien under it or not, but for the purpose of seeing whether his judgment remained alive under it until the ninth of November, 1866, for it is not claimed that he ever caused his judgment to be registered.

In accordance with the opinion which we have uniformly held, a judgment creditor lost none of his rights by the non-issuance of execution when hindered by any of the laws known as the stay laws. Moore, then, had a valid, living judgment, on the ninth of November, 1866.

The act passed on that day provides, that whenever final judgment shall be rendered by any court of record of this State, such judgment shall become a lien on all the real estate of the judgment debtor situate in the county where the judgment is rendered. A proper un-

derstanding of this clause of the statute leads directly to the disposition of this case.

It will be observed that on the tenth day of November, 1866, the Legislature passed another stay law.

The lien secured under the act of ninth of November, 1866, was lost, unless execution issued upon the judgment within one year from the first day upon which such execution could by law be issued thereon.

It matters not, in the judgment of this court, whether the law of the tenth of November, 1866, be declared unconstitutional, or not. We are clearly of opinion that if Moore gained a lien upon the land by operation of the act of the ninth of November, and was hindered from issuing his execution within the year, by the act of the tenth of November, 1866, he did not lose his lien, for he is guilty of no laches. The determination of this case, then, rests upon the interpretation to be given to that clause of the act of November 9, 1866, which gives a lien to judgments which *shall be* rendered.

A very learned discussion is found in the briefs, of the true rendering of this passage. Grammarians not unfrequently, in the construction of sentences, use the terms "shall be" and "shall have been" indifferently. Grammatical nicety only accords this privilege where time is really not referred to, but where the term is used rather as a constituent part of a proposition; thus we say indifferently, when a judgment shall be rendered, or when a judgment shall have been rendered, a lien shall attach, etc.

We are led to conclude that the Legislature used the words "shall be" in this manner; they would otherwise have been separated by the word *hereafter*, or the words *in the future*. And there was, in justice, no reason for making an invidious distinction against judgments, and to the prejudice of judgment creditors, tied

up and hindered during the long period of the civil war. Had it been the policy or intention of the Legislature to make a distinction between judgments rendered before, and those after the act, justice and a sound regard to the rights of parties would have given the preference to the older judgments.

That principle of the law which holds parties guilty of laches to have thereby lost their rights, is founded in sound policy. But he is not guilty of laches whose remedies are either suspended or taken away from him by the supreme power of the State, under the seeming dictation of necessity. By civil war the normal conditions of society are necessarily more or less disturbed. The law, to which every man ordinarily looks for the protection of his rights, not unfrequently turns away from the individual, withdrawing its protection, and becoming a strong engine of oppression.

It has been said, "*inter arma leges silent.*" The laws were not silent during our late civil war, but, under the restored authority of the government of the United States, it has been found necessary to set aside and disregard many of the acts of legislation passed by an insurgent people. This court has declared unconstitutional the so-called stay laws ; but we are compelled to attach such significance to them as will at least preserve the rights and equities of the people, so far as we have the authority to do.

A question is raised upon the record in this case, which the very learned counsel have not discussed, nor should we deem it necessary to the decision of the case, were it not that we are divided in opinion upon it.

It is thought that the law of ninth of November, 1866, attaching a lien to judgments, could have no application to judgments rendered prior to the passage of the act, and that such a law would be unconstitutional, as impairing the obligation of contracts.

A majority of the court conceive it to be clearly within the power of the Legislature to apply the act to judgments previously rendered, as well as those to be rendered in the future.

The law simply applies to the enforcement of the remedy, impairing no obligation of the contract. (See Crawford v. Bender, decided at the last term of this court, and numerous decisions therein cited.)

Cooley, in his learned work on constitutional limitations, after discussing the obligations of a contract, gives us so able a view of this question that we must be excused for introducing lengthy extracts, with citations of very numerous authorities : "Such being the obligation of a contract, it is obvious that the rights of the parties in respect to it are liable to be affected in many ways by changes in the laws, which it could not have been the intention of the constitutional provision to preclude.

"There are few laws which concern the general police of a State, or the government of its citizens, in their intercourse with each other or with strangers, which may not in some way or other affect the contracts which they have entered into or may thereafter form. For what are laws of evidence, or which concern remedies, frauds and perjuries, laws of registration, and those which affect landlord and tenant, sales at auction, acts of limitation, and those which limit the fees of professional men, and the charges of tavern keepers, and a multitude of others, which crowd the codes of every State, but laws which affect the validity, construction, duration or discharge of contracts. (Washington, J., in Ogden v. Saunders, 12 Wheat., 259.)

"But the changes in these laws are not regarded as necessarily affecting the obligation of contracts. Whatever belongs merely to the remedy may be altered

according to the will of the State, provided the altera-
tion does not impair the obligation of the contract
(Bronson v. Kenzie, 1 How., 316, per Taney, Ch. J.);
and it does not impair it, provided it leaves the parties
a substantial remedy, according to the course of jus-
tice as it existed at the time the contract was made.
(Stocking v. Hunt, 3 Denio, 274; Van Baumbach v.
Bade, 9 Wis., 578; Bronson v. Kenzie, 1 How., 316;
McCracken v. Hayward, 2 How., 608; Butler v. Palmer,
1 Hill, 324; Van Rensalaer v. Snyder, 9 Barb., 302,
and 13 N. Y., 299; Conkey v. Hart, 14 N. Y., 22; Guild
v. Rogers, 8 Barb., 502; Story v. Furman, 25 N. Y.,
214; Coriell v. Ham, 4 Green (Iowa), 455; Heyward
v. Judd, 4 Minn., 483; Swift v. Fletcher, 6 Minn., 550;
Maynes v. Moore, 16 Ind., 116; Smith v. Packard, 12
Wis., 371; Grosvenor v. Chesley, 48 Me., 369; Van Ren-
salaer v. Ball, 19 N. Y., 100; Van Rensalaer v. Hays,
ib., 68; Litchfield v. McComber, 42 Barb., 288; Pas-
chal v. Perez, 7 Tex., 365; Auld v. Butcher, 2 Kansas,
155; Kenyon v. Stewart, 44 Penn. St., 179; Clark v.
Martin, 49 Penn. St., 299; Rison v. Farr, 24 Ark., 161;
Sanders v. Hillsborough Insurance Company, 44 N. H.
238; Huntzinger v. Brock, 3 Grant's cases, 243; Me-
chanics, etc., Bank Appeal, 31 Conn., 63.)

"It has accordingly been held that laws changing
remedies for the enforcement of legal contracts will be
valid, even though the new remedy be less convenient
than the old, or less prompt and speedy. (Ogden v.
Saunders, 12 Wheat., 270; Beers v. Haughton, 9 Pet.,
359; Bumgardner v. Circuit Court, 4 Mo., 50; Tarpley
v. Hamer, 17 Miss., 310; Quackenbush v. Danks, 1
Denio, 128; 3 Denio, 594; and 1 N. Y., 129; Bronson
v. Newberry, 2 Doug. (Mich.), 38; Rockwell v. Hub-
bell's Adm'rs., ib., 197; Evans v. Montgomery, 4 W.
and S., 218; Holloway v. Sherman, 12 Iowa, 282;

Sprecker v. Wakeley, 11 Wis., 432; Smith v. Packard, 12 Wis., 371; Morse v. Goold, 11 N. Y., 281; Penrose v. Erie Canal Company, 56 Penn. St., 46.)

"Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct. (Sturges v. Crowninshield, 4 Wheat., 122, per Marshall, Ch. J.) A statute allowing the defense of want of consideration in a sealed instrument previously given, does not violate the obligation of contracts. (Williams v. Haines, 27 Iowa, 251.) To take a strong instance, although the law at the time the contract is made permits the creditor to take the body of his debtor in execution, there can be no doubt of the right to abolish all laws for this purpose, leaving the creditor to his remedy against property alone. 'Confinement of the debtor may be a punishment for not performing his contract, or may be allowed as a means of inducing him to perform it. But the State may refuse to inflict this punishment, or may withhold this means, and leave the contract in full force. Imprisonment is no part of the contract, and simply to release the prisoner does not impair the obligation.' (Sturges v. Crowninshield, 4 Wheat., 122, per Marshall, Ch. J.; Mason v. Haile, 12 Wheat., 370; Bronson v. Newberry, 2 Doug., (Mich.,) 38; Maxey v. Loyal, 38 Ga., 540.) Nor is there any constitutional objection to such a modification of those laws which exempt certain portions of a debtor's property from execution as shall increase the exemptions, nor to the modifications being made applicable to contracts previously entered into. The State may, if it thinks proper, direct that the necessary implements of agriculture, or the tools of the mechanic, or articles of necessity in household furniture, shall, like wearing apparel, not be liable to execution on judgments. Regulations of this description have always been

considered, in every civilized community, as properly belonging to the remedy, to be exercised or not, by every sovereignty, according to its own views of policy and humanity. It must reside in every State, to enable it to secure its citizens from unjust and harassing litigation, and to protect them in those pursuits which are necessary to the existence and well being of every community. (Bronson v. Kenzie, 1 How., 311, per Taney, Ch. J.; Rockwell v. Hubbel's administrators, 2 Doug. (Mich.), 197 ; Quackenbush v. Danks, 1 Denio, 128 ; 3 Denio, 594, and 1 New York, 129 ; Morse v. Goold, 11 N. Y., 281 ; Sprecker v. Wakeley, 11 Wis., 432 ; Cusic v. Douglass, 3 Kansas, 123 ; Maxey v. Loyal, 38 Ga., 531; Hardiman v. Downer, 39 Ga., 425.) The increase in exemptions, however, must not go to the extent to render the remedy nugatory or impracticable. (Stephenson v. Osborne, 41 Miss., 119.) It has been decided that a homestead exemption may be made applicable to previously existing contracts. (Hill v. Kessler, 63 N. C., 437 ; Hardiman v. Downer, 39 Ga., 425.) 'Statutes pertaining to the remedy are merely such as relate to the course and form of proceedings, but do not affect the substance of a judgment when pronounced.' (Per Merrick, Ch. J., in Morton v. Valentine, 15 La. An., 153.)

"And laws which change the rules of evidence, relate to the remedy only ; and while, as we have elsewhere shown, such laws may, on general principles, be applied to existing causes of action, so, too, it is plain that they are not precluded from such application by the constitutional clause we are considering. (Neass v. Mercer, 15 Barb., 318. On this subject, see the discussions in the Federal courts, Sturges v. Crowninshield, 4 Wheat., 122; Ogden v. Saunders, 12 Wheat, 213 ; Bronson v. Kenzie, 1 How., 311 ; McCracken v. Hayward, 2 How.,

608.) And it has been held that the Legislature may even take away a common law remedy altogether, without substituting any in its place, if another and efficient remedy remains. Thus, a law abolishing distress for rent has been sustained as applicable to leases in force at its passage. (Van Rensalaer v. Snyder, 9 Barb., 302, and 13 N. Y., 299 ; Guild v. Rogers, 8 Barb., 502 ; Conkey v. Hart, 14 N. Y., 22.) And it was also held that an express stipulation in the lease, that the lessor should have this remedy, would not prevent the Legislature from abolishing it, because this was a subject concerning which it was not competent for the parties to contract in such a manner as to bind the hands of the State. In the language of the court, ' If this is a subject on which parties can contract, and if their contracts, when made, become by virtue of the Constitution of the United States, superior to the power of the Legislature, then it follows, that whatever at any time exists as part of the machinery for the administration of justice, may be perpetuated, if parties choose so to agree. That this can scarcely have been within the contemplation of the makers of the Constitution, and that if it prevail as law it will give rise to grave inconveniences, is quite obvious. Every such stipulation is in its own nature conditional upon the lawful continuance of the process. The State is no party to their contract. It is bound to afford adequate process for the enforcement of rights, but it has not tied its own hands as to the modes by which it will administer justice. Those from necessity belong to the supreme power to prescribe, and their continuance is not the subject of contract between private parties. In truth, it is not at all probable that the parties made their agreement with reference to the possible abolition of distress for rent. The first clause of this special provision is, that the lessor may distrain,

sue, re-enter or resort to any other legal remedy ; and the second is, that in cases of distress the lessee waives the exemption of certain property from the process, which by law was exempted. This waiver of exemption was undoubtedly the substantial thing which the parties had in view ; but yet, perhaps, their language cannot be confined to this object, and it may, therefore, be proper to consider the contract as if it had been their clear purpose to preserve their legal remedy, even if the Legislature should think fit to abolish it. In that aspect of it, the contract was a subject over which they had no control.' (Conkey v. Hart, 14 N. Y., 30 ; citing Handy v. Chatfield, 23 Wend., 35 ; Mason v. Haile, 12 Wheat., 370 ; Stocking v. Hunt, 3 Denio, 274 ; and Van Rensa-laer v. Snyder, 13 N. Y., 299.)''

If this reasoning and this authority do not fully and beyond a doubt settle this question, we confess we are yet in gross ignorance of the true interpretation of the Constitution of the United States, and of the powers of the several State Legislatures under their Constitutions.

For the reasons herein given, the judgment of the district court is reversed, and the cause remanded.

OGDEN, J.—Being unable to concur in the opinion of the court in this case, I deem it my duty to briefly state the grounds of my dissent.

In the first place, it may be assumed as an incontrovertible rule that the legislative power to enact laws is absolute, provided it is not exercised in conflict with the fundamental law of the land, or in violation of the natural and inalienable rights of the citizens. (Sedgwick on Stat. and Con. Law, 152 ; Dwarris on Stat. and Con. Law, 122, 314.) And Justice Cooley says, substantially, the legislative power must be understood to be full and complete, as the sovereign power of the

country (Cooley's Con. Lim., 87); and therefore, when the Legislature has enacted a law with all requisite formalities, not subject to the Constitutional limitation, it becomes the expression of an absolute sovereignty, and entitled to the respect and obedience of every functionary of government, whether executive or judicial, as well as every citizen of the State. It follows that whenever the legislative will has been constitutionally expressed in plain and intelligible words, there is no legitimate power in the land to alter, change, or construe the expression of that will. (Thompson v. Buckley, 1 Texas, 35.) Mr. Sedgwick, in considering the judicial power over statutory enactments, says, "that if the intention of the law-makers is expressed in a manner devoid of contradiction and ambiguity, there is no room for interpretation or construction, and the judiciary are not at liberty, on considerations of policy or hardship, to depart from the words of the statute." (Sedgwick on Stat. and Con., 295.) And Judge Cooley, in reiterating the same doctrine, says, "It is to be presumed that language has been employed with sufficient precision to convey it (the intent), and unless examination demonstrates that the presumption does not hold good in the particular case, nothing remains except to enforce it." (Cooley on Con. Lim., 55.) But instances may arise when the language used may be capable of two meanings, or may be so indefinite as not to express any distinct meaning, in which case it is the duty of the courts, after a thorough comparison of every expression in the whole act, to so interpret the language, and construe the meaning of the Legislature, as to make every part harmonize in the best rule possible for the promotion of the general good. (Dwarris on Stat. and Con., 47.)

With the foregoing rules of judicial decision as a

guide, what should be the proper construction of the statute of the ninth of November, 1866 ?—the first clause of the first section of which reads as follows: "That whenever final judgment shall be rendered by any court of record of this State, such judgment shall be a lien on all the real estate of the judgment debtor, situated in the county where the judgment is rendered, from the date of the judgment." I have been unable to discover any ambiguity or uncertainty in the language of this act. It is in plain and intelligible words, and in itself cannot possibly have but one meaning ; but simply declares the present will of the Legislature, that from and after the passage of that act, all judgments which shall be rendered by any court of record shall be a lien on all the real estate of the debtor. This act, in my judgment, can by no possibility have any reference to any debts, but judgments which were rendered after the passage of the act. The whole language most clearly has reference to the future tense only. But the learned counsel for appellant contends that the verb *shall be* refers to the past tense, and gravely proposes to appeal from Lindley Murray and the schoolmaster to the judicial view of the question. I have yet to learn that legal principles are, or should be, enunciated in violation of the most simple rules of grammatical construction ; and I have also to learn that courts should add to, or take from, the language of a statute, in order to change the gender of a noun, or the tense of a verb, so as to force upon a statute a meaning foreign to its legitimate and grammatical construction. But if the construction of the verb, *shall be*, given by the court, or that of the counsel for appellant, be adopted in the first clause of the act, there is no reason that it should not be adopted in the second clause, and that would render the whole act an absurdity. It is, however, believed

that no such strained construction or judicial legislation was contemplated by the law-making power. Indeed, the Legislature had no right to think that any such legislation was needed ; and the very fact that under the then existing laws there could be no such legislation required, is conclusive proof that the act was not intended to have a retroactive effect. Up to the day of the passage of that act, there was a law in full force abundantly providing for, creating, and preserving judgment liens, and the Legislature had no right to suppose that creditors had disregarded the law, and neglected to secure the right given them by statute. Had the appellant been watchful of his own interest, and registered his judgment in the county court, as the law authorized him to do, there would have been no necessity for legislation for his benefit, and the courts would not now be importuned to give him, by a kind of judicial legislation, that which he had lost by his own laches. It is intimated, in the opinion of the court, that the late war had prevented the appellant from securing his rights ; but I was not aware that during the war a person could not register a deed or judgment to secure his lien. But the act of 1866 declares that the lien shall take effect from the date of the judgment ; if, therefore, the construction given to that statute by the decision in this case be a correct one, then in this case it related back for six years; and if it could relate back for six years, why not for twenty? and create a lien in violation of the law then in force, and, in my opinion, be in direct violation of the Constitution, which declares that "no retroactive law, or any law impairing the obligation of contracts, shall be made," and in total disregard of every elementary authority on that subject. Blackstone says, "all laws should be therefore made to commence

*in futuro;* " "if not, they would be worse than the laws of Caligula, which were made for the purpose of enslaving the people." (Blackstone's Com., 1 Vol., 46.) Mr. Dwarris very forcibly contends that "to establish a rule by which a person should be required to shape his past conduct, would be to legislate an absurdity ; that retrospective laws are inconsistent with the idea of a law as a rule of civil conduct." (Dwarris, Stat. and Con., 165.) Mr. Sedgwick, after examining the laws and decisions of England to a great length, comes to the conclusion that a statute must have a prospective effect only, unless the will of the Legislature is clearly expressed to the contrary ; and he says, "In this country the same opposition to giving statutes a retroactive effect has been manifested, and such is the general tenor of decisions." (Sedgwick, Stat. and Con., 191.) Judge Cooley adopts the same general rule, and says, "It is a sound rule of construction to give a statute a prospective operation only, unless its terms show a legislative intent that it should have a retrospective effect." (Cooley's Con. Lim., 370.)

It is not denied, by any known authority, that the Legislature may, by express enactment, especially when not prohibited by the Constitution, pass laws in some instances which shall have a retroactive effect, such as to cure some defect in legal proceedings, some irregularity in the assessment of taxes, some irregularities in elections, and the like, when the statutory power has failed of due execution, or acts regulating the collection of debts, legalizing imperfect mortgages, and in some other cases, where the statute would regulate and not create nor destroy vested rights. But, in these cases, there must be no constitutional prohibition, and the statute must expressly declare the retroactive

effect.    (Cooley's Con. Limitation, 370–372.)  In the
case at bar, there is no express will of the Legislature
that this act of 1866 should have a retroactive effect.
And our Constitution expressly prohibits the making
of such a law.

The opinion in this case declares that the law of
1866 "applies to the enforcement of the remedy, and
impairs no obligation of contract."  But, in my humble
opinion, the effect will be the reverse in this case, as it
will affect no remedy, but destroy a vested right in one,
and give it to another.   It is believed that the appellant
will consider the decision of this case something more
than an application of a remedy, for it creates in him a
lien which he had never had, and guarantees the pay-
ment of his debt, which he had lost by his own neglect.
It is also believed that the appellee will consider this
law, as construed, rather a severe application of a
remedy, as it will in effect rob him of the fruits of his
vigilance in the collection of his debt, and now take
from him the land he has bought and paid for, and give
it to another, who is not entitled to it on account of his
laches alone.   A legitimate supposition would also
show most conclusively that the law of 1866, as con-
strued by the court, might materially affect the vested
rights and interests of third parties.   It is admitted
by the court, that from 1861 to 1866 there was no judg-
ment lien on the land of Hardiman, the original debtor,
and that during that time Hardiman had the absolute
right to alienate or otherwise dispose of the same.   Had
this been done, then the rights of innocent third parties
might have attached.   But the law of 1866 declares
that the lien shall take effect from the date of the judg-
ment.   If, therefore, that law is construed to relate to
judgments previously rendered, it would inevitably fol-
low that innocent purchasers, who had received good

titles at the time of their purchase, would be despoiled of their property contrary to every principle of justice and equity, in order to award it to a party who had slept upon his rights for nearly six years.

I have been unable to examine the great number of authorities referred to in the opinion, which were copied with the extracts from Cooley on Constitutional Limitation, because of their great number, and because some are not found in the library, but more especially because it is admitted that the propositions enunciated in the opinion, as decided in the cases referred to, are correct principles of law, and yet, in my humble judgment, have no application to the case at bar. From the considerations herein expressed, I am unwilling to concur in the judgment of the court in this cause.

I am fully of the opinion that the Legislature never intended that the law of 1866 should have a retroactive effect; that if it had so intended, it failed to embody that intention in the statute ; and that if it had so intended and had so declared, then it had no power or authority to pass such a law, and its act in that respect would be null and void. There may have been an error in the judge's charge, in relation to dormant judgments, but in my opinion of the law of the case, it is wholly immaterial whether appellant's judgment was dormant or not. I am of the opinion that the judgment of the district court should be affirmed.

REVERSED AND REMANDED.